[Civ. No. 5973. First Appellate District, Division Two.—April 24, 1928.]

WILLIAM B. WEIR et al., Appellants, v. NEW YORK LIFE INSURANCE COMPANY (a Corporation), Respondent.

Hunsaker, Britt & Cosgrove and John M. Clayton for Appellants.

Meserve & Meserve and Timon E. Owens for Respondent.

KING, P. J., *pro tem.*—Action for recovery on a life insurance policy.

Judgment was given for defendant and plaintiffs appeal.

William R. Whittier applied October 1, 1920, for a policy of life insurance in the sum of $25,000. The application was accompanied by a document in two parts, the first consisting of questions asked by the local examining physician and answers by the applicant signed by both, and the second a "medical examiner's report" signed by the physician alone.

They were received by the company November 11, 1920, and by the company's medical examiner November 12, 1920. Because the applicant stated that he had applied to "Travelers 1917 and 1920" for other insurance which had been declined, and because of his answer to questions regarding his use of intoxicants that he uses wine moderately, had used it moderately in the past, and had not used intoxicants to excess within the past five years, this medical examiner sent a communication November 12, 1920, "to the examining physician with regard to the applicant's habits and calling for an investigation of the applicant as an insurance risk and calling for an insurance report."

He received a report from one H. C. Wilson, living at Hemet, California, near the applicant, who had known the applicant eight or ten years, and who reported that the applicant uses intoxicating drinks, becomes intoxicated "generally lasts a number of days" and in response to a question as to when this last occurred answered, "As far as I can learn it has been some time ago" and under the head of Remarks adds: "Think he is healthy enough but likes liquor too well; but still he puts in quite a large amount of his time at the ranch here, which keeps him in good condition."

On the examiner's recommendation a policy was written for $5,000 only with a premium rating increased to 190 because of increased risk, as compared with a standard rating of 100, which policy was forwarded to the San Francisco office dated November 18, 1920.

On November 20th the company received a second report from one O. L. Comings of San Francisco, "some information" from the Travelers Insurance Company with respect to Whittier's application to that company, and a reply from the doctor who had examined the applicant. These were examined by the company's medical examiner November

26th and a new policy written and delivered for $10,000 with a rating of 140, the $5,000 policy being withdrawn. This new policy dated December 3, 1920, is the basis of the suit.

The inspection report of O. L. Comings stated that he had known applicant 20 years; that he uses intoxicating drinks moderately; that he became intoxicated "in the nature of a few hours' hilarity," which occurred not since 1906; that he had never taken a cure for the liquor habit; and under the head of "Remarks" stated: "He followed in the line of rich men's sons."

The reply from the doctor who examined the applicant was to the effect that he had seen Whittier under the influence of liquor eight years ago; has heard of his being under the influence of liquor "several years ago"; does not know how frequently he has been under its influence; answers "not to my knowledge" in response to a question asked as to appellant's ever taking a cure; and that there is no present indication of the use of alcohol. He adds: "Some years ago I understood Mr. Whittier drank considerable but of late years he seems to attend to business promptly and I have no knowledge of him taking liquor excessively."

A report was also received by the company from one M. S. Scott, who reports that applicant does not use intoxicating drinks to excess, if at all; that he cannot learn of his ever becoming intoxicated; has not taken a cure for the liquor habit.

The medical examiner and the company also received information from the Travelers Insurance Company that Whittier had applied to that company twice, in 1917 and in 1920; that when examined he admitted having used alcoholic stimulants to excess in 1890, and having taken the liquor cure in 1890, and in the later application admitted that he used alcoholic beverages to excess up to about 1916.

Whittier died at Hemet, California, March 1, 1921.

Proofs of death were filed with the company and on May 16, 1921, the company rejected the claim and tendered to appellants a check for $658.20, the amount of the one premium paid with interest.

Respondent (defendant) took depositions of five officers of defendant—and at the beginning of the trial appellants read these into the record.

Upon a controversy regarding this matter the court held that appellants were not entitled to the benefit of section 2055 of the Code of Civil Procedure, so far as the depositions then in evidence were concerned and that appellants were bound by the testimony contained in the depositions upon the theory that appellants had produced the witnesses and had put them upon the stand as appellants' witnesses without having distinctly announced their reliance on section 2055 of the Code of Civil Procedure.

Appellants contend this was error and the refusal of the court to allow contradiction of these witnesses warrants a new trial.

Attached to these depositions were the following exhibits, each of which was introduced by plaintiffs:

"Ballard's Exhibit A," the application for insurance, answers made to examining physician;

"Ballard's Exhibit B," the proof of death;

"Harrison's Exhibit A," inspection report by H. C. Wilson, above mentioned;

"Harrison's Exhibit B," inspection report by O. L. Comings, before mentioned;

"Harrison's Exhibit C," inspection report by examining physician, above mentioned;

"Harrison's Exhibit D," inspection report by M. S. Scott, before referred to.

*Ballard's Exhibits:*

"C" Letter by one of the plaintiffs accompanying the proofs of death.

"D" Letter from the company rejecting claim.

"E" Check for $658.20—above referred to.

"F" Letters returning check to company.

"G" Letters from counsel for company denying liability.

The only other documentary evidence was: Plaintiffs' No. 3 the policy; plaintiffs' No. 4 the assignment of policy to plaintiffs; plaintiffs' No. 5 a letter from the company; and plaintiffs' No. 6 a letter from one plaintiff to the company; "Defendant's Exhibit A," the certificate of death and "Defendant's Exhibit B," a paper signed by Dr. H. O. Miller—who had signed the death certificate.

The findings by the trial court are full and voluminous, and many of them are attacked by appellants.

Finding III is to the effect that the policy was issued by defendant "relying on the representations and statements so made (that is in the application and the medical application accompanying it), and each and every of them, and said defendant corporation would not have executed or delivered said policy of life insurance but for said representations and statements, and its reliance thereon, and had it known that any of said representations were not true, but were false and untrue, defendant corporation would not have executed nor would it have delivered said policy."

However, it appears from the testimony of the company defendant's medical examiner, Dr. Harrison, of W. F. Rohlffs, its assistant secretary, and of T. A. Buckner, a member of its classification committee, the three officials before whom the application for the policy came, and on whose approval it was issued, that before the policy was issued they had before them the report of H. C. Wilson, of O. L. Comings, from M. S. Scott, the further report from the examining physician and the information given them by the Travelers Insurance Company.

This evidence is uncontradicted and from it the conclusion is irresistible that the company did know that some of the applicant's representations were untrue, and that it issued the policy for a reduced amount in spite of that fact.

In finding VI it is found that each and every of the questions and the answers thereto in the application and in the medical examination "was and were and each is material to the risk and" that upon said answers "defendant, believing the same to be true executed" the policy. Also that "Defendant would not have executed, signed or delivered said policy . . . but for said statements and representations so made, and because of the same being material, and because of its reliance thereon and its belief in the truth of the same."

It is also found in paragraph VI of the findings that in the medical examination are the following questions and answers:

8. Have you ever suffered from any ailment or disease of
   (a) The brain or nervous system?  A. No.
   (b) The heart or lungs?  A. No.
   (c) The stomach or intestines, liver, kidneys or bladder?
       A. No.

9. (e) What physician or physicians, if any, not named above, have you consulted or been treated by, within the last five years, and for what illness or ailment?

A. Dr. Garnard Grant, three months ago, cold, complete recovery.

And it is found that "the answers in this finding above set forth, to each and every of the questions above set forth, were, and each of said answers was false and untrue," and, at the time the "same were made . . . were known by him to be false and untrue, and were made by him for the purpose of deceiving defendant and causing it to issue the policy."

Yet, as before stated, it is in evidence that the officials of the respondent company did not "believe the same to be true"; and did not execute the policy "because of its reliance thereon"; and there is only the slightest, if any, evidence that any of the answers listed were not true.

It is further found in finding VI that decedent "had taken what is known as the Keely cure."

The sole reference to this subject in the evidence is to be found in the testimony of Harrison, the medical examiner of the company, who states that November 26, 1920, he had before him certain information from the Travelers Insurance Company received by his company November 20th, showing that deceased had applied to that company and had admitted "having used alcoholic stimulants to excess in 1890, and having taken the liquor cure in 1890."

It will be noticed then (1) that this is not evidence that decedent took the cure; (2) that if he did it was 30 years before; and (3) that the medical examiner had the information before him when the policy was written, and the company did not issue the policy in reliance on the applicant's statement.

It is further found in finding VI "that decedent had suffered from an ailment of the heart, of the kidneys and of the bladder and of the nervous system. That in 1920 . . . he was attended by Dr Miller . . . for nervousness, sleeplessness, pains in the heart and heart region, somnolence and urinary disorders of the kidneys and bladder."

The testimony of Dr. Miller shows that in July and August of 1920, the trouble for which he treated the deceased was drunkenness. He states that deceased mentioned

"trouble with his bladder—frequency of urination," but explicitly states that no medicine was given for this; that the treatments were entirely for acute troubles and not for chronic illness.

None of this forms a basis for the finding.

Later in the same paragraph is a finding again that Dr. Miller treated the decedent for "acute nervousness, chronic nephritis, pains in the heart, somnolence and diseases of the kidneys and bladder and of the urinary tract." Yet the testimony of the several physicians examined distinctly shows the man never had chronic nephritis and fails to show any treatment for this disorder.

Again in this paragraph are findings that one Dr. Grant had treated the deceased for at least two years for various and different ailments and illnesses other than a cold, and for an ailment that caused one of his arms to be partially useless, as well as for sleeplessness and nervousness.

The uncontradicted evidence of Dr. Grant, however, is to the effect that, while he examined Mr. Whittier many times over a period of two or three years, the only treatments he ever gave were for a bronchitis or cold at one time, and that he irrigated decedent's eye with a little borax solution for an eye ulcer.

It appeared from the evidence that in 1918 Whittier had a phagedenic ulcer of the cornea of the eye, which is described by the physician as "a slight abrasion of the skin and an infection of the superficial layers of the cornea." He recovered in a relatively short period of time, and the doctor states that it was a temporary ailment of rather a minor type. In the treatment Whittier's tonsils were removed as a possible source of infection, but it did not distinctly appear that they were infected or the removal necessary.

Based upon the above facts, findings are made that the cause of the ulcer of the cornea of the eye was some disease of the blood; and that deceased had some disease of the blood, the cause of which none of said physicians could give. This finding is made in the face of evidence of Dr. Grant and Dr. Stoner, who repeatedly and frequently made examinations of Whittier—Grant a dozen times in a period of two or three years—always doing a urinalysis and taking a blood pressure; ran a blood chemistry determina-

tion, did a blood count, and ran a Wasserman test. They reported everything normal and the Wasserman negative.

The finding also is not supported by evidence.

The certificate of death gives the cause of death as uraemic poisoning and the contributing cause as chronic interstitial nephritis, and certifies the disease was incurred "during past several years." Dr. H. O. Miller, who issued the death certificate, also made an affidavit in which he recites that he treated decedent for "various complaints. Nephritis was a gradual development becoming acute six months ago." That he treated Whittier for "nephritis and other complaints" in July and August, 1920; that he treated him prior to last sickness for "such symptoms as nervousness, sleeplessness, pains in heart region, somnolence and urinary disorder"—gives "uraemic poisoning due to chronic nephritis" as the immediate cause of death, and states his opinion that deceased suffered from the disease several years. Based upon these two documents, the court finds that the immediate cause of death was uraemic poisoning due to chronic nephritis.

However, this statement was practically repudiated by Dr. Miller when called as a witness. He substantially testified that Whittier died of alcoholism, although admitting the possibility of death occurring from a hypodermic administered by himself, and states that he gave the certificate of death from uraemic poisoning to avoid certifying to alcoholism as the cause of death.

Dr. Grant and Dr. Stoner testify that it was impossible that nephritis could have been the cause of death. Dr. Grant states he examined Whittier in 1918, when he "had no sympton of either uraemic poisoning or nephritis, either acute or chronic." That in November, 1920, he examined Whittier, and took his blood pressure in December close to the holidays (ten weeks before death), and that neither chronic uraemic poisoning or chronic nephritis could have been the cause of death. Dr. Stoner "don't see how it was possible" for either disease to have caused death. Dr. Strasser, who as representative of the respondent examined Whittier for the insurance, states that he "was not at the time suffering" from either. And, finally, the officials of the company who testified stated that they did not consider deceased died of these diseases.

Dr. Miller, who gave the medical certificate of death and who was the only person even suggesting uraemic poisoning or nephritis (Bright's disease) as the cause of death, so thoroughly repudiates his statement that we feel justified in holding that this finding of the cause of death as chronic nephritis is not sustained by the evidence.

The trial court in its finding numbered VIII declares that the company did not find out that Whittier's answers to questions hereinbefore quoted were untrue until after the death of Whittier; and that upon being advised of said false and fraudulent misrepresentations (after the death of the insured) it repudiated and canceled the policy.

The fact is, however, that the company knew of the dissipated habits of deceased before issuing the policy and issued it in a reduced amount and at an increased premium rate because of its knowledge.

Feeling that there is in some instances a total want of evidence, and in others no substantial evidence to support the findings, it is the duty of the court to set aside the findings above noted and other parts of the findings to the same effect.

While we have disagreed with the trial judge on many of the findings made, we are not disposed to criticise his action in any particular for signing the findings as presented. It has required long and careful search and scanning of the record to find the evidence bearing upon them respectively, an effort which a busy trial judge should not be required to make. Counsel are prone in many cases, after a favorable decision is announced, to draft and present for signature by the judge a mass of findings favorable to their contentions without a proper scrutiny of the record to see if they are well founded. Thus we find in the instant case an answer covering eighteen pages of the transcript, and findings even longer.

The question as to plaintiffs being bound by the introduction into evidence by them of the depositions of the officers of defendant corporation with the accompanying exhibits is novel and interesting.

It will be noted that the depositions were taken on defendant's motion.

The trial judge in ruling upon the question said: "Unless he states in advance, or during some part of his examina-

tion, that he is acting under section 2055 of the Code of Civil Procedure, it would seem to me he ought to be bound upon the theory that he has produced that witness and has put him upon the stand as his witness." Many lawyers and judges will agree with this theory.

However, we find the case of *Grantham* v. *Ordway*, 40 Cal. App. 758, 764 [182 Pac. 73, 76], an action for damages against a corporation and Ordway, one of its employees. In anticipation of the trial the defendant took the deposition of Ordway, a defendant and its employee, and plaintiff as a part of his case read this deposition to the jury. Mr. Presiding Judge Waste in the decision says: "Furthermore, plaintiff is not bound by Ordway's testimony," and quotes the provisions of section 2055 of the Code of Civil Procedure.

This seems squarely in point.

See, also, *Figari* v. *Olcese*, 184 Cal. 775, at page 782 [15 A. L. R. 192, 195 Pac. 425].

For reasons herein stated the judgment should be reversed.

Sturtevant, J., and Nourse, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 24, 1928, and a petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 21, 1928.

All the Justices concurred.