[Civ. No. 25418.    Second Dist., Div. Three.    Mar. 29, 1962.]

PATRICIA K. BURNS, Plaintiff and Appellant, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant and Respondent.

Jack Dunaway for Plaintiff and Appellant.

Adams, Duque & Hazeltine, James S. Cline and John H. Brinsley for Defendant and Respondent.

FILES, J.—This is an action upon a $10,000 life insurance policy issued by the defendant on the life of plaintiff's husband, Sidney D. Burns. The policy was taken out on May 15, 1957, and Mr. Burns died on September 1, 1958. An autopsy established that death was the result of a coronary thrombosis. Defendant then acted to rescind the policy on the ground of misrepresentations and concealments of fact. An agreed pretrial statement limited the controverted issues at the trial to whether the application for the policy contained false representations or concealments of fact; and if so, whether such misrepresentations or concealments of fact were material to the risk undertaken by defendant. At the close of the evidence the court directed a verdict for defendant. Plaintiff appeals from the judgment.

The underlying legal principles are established by statute and by case law. ▮▮ A life insurance company is entitled to select and classify its risks, and for this purpose is entitled to demand a truthful statement of the applicant's medical

history. Material misrepresentations or concealments in this respect are grounds for rescission of the policy. (Ins. Code, §§ 331, 359; *Cohen* v. *Penn Mutual Life Ins. Co.*, 48 Cal.2d 720, 727 [312 P.2d 241]; *Robinson* v. *Occidental Life Ins. Co.*, 131 Cal.App.2d 581, 586 [281 P.2d 39]; *National Life & Acc. Ins. Co.* v. *Gorey* (9th Cir.) 249 F.2d 388.)

In this case the contract of insurance was issued upon a written application signed by the deceased. This application included the following questions, with answers given by the applicant:

"7. Have you ever: (Give below full particulars with respect to each part of each question to which the answer is 'Yes'.) . . .

"c. had any X-rays or electrocardiograms, or blood or other medical tests? No. . . .

"9. Have you ever been treated for or had any known indication of: (Give below full particulars with respect to each part of each question to which the answer is 'Yes'.)

"a. heart trouble or murmur, chest pain, high blood pressure, or abnormal pulse? No. . . .

"10. Other than stated in answer to Question 9 have you ever been treated for or had any known indication of any disease or disorder of the: (Give below full particulars with respect to each part of each question to which the answer is 'Yes'.)

"a. heart, blood, or blood vessels? No."

The record shows without conflict that these negative answers were untrue. Dr. Rossman, called as a witness for plaintiff, testified to the medical history given by Mr. Burns when he came in for a checkup on August 13, 1956. Mr. Burns said that in 1949 he had an attack of shortness of breath and had been examined by Dr. Carl Williams. After that he saw Dr. Fred Kirby about pains in the chest and a rapid pulse. Mr. Burns was told by Dr. Kirby that his heart was fibrillating. In 1951 Mr. Burns was told that he had a heart valve hardening. He took empirin and codeine for chest pain and had been told to take quinidine if he ever felt that his heart was going rapidly. Quinidine is a depressant for the heart which calms irregular beatings and is used for certain types of fibrillation. Dr. Rossman produced the tracings of electrocardiograms which had been taken on eight different occasions between 1952 and 1956 and which Mr. Burns had delivered to him at the time of the 1956 checkup.

The office record of Dr. Williams, now deceased, is in evi-

dence. The record includes the following entries: "4-20-49 Pain under sternum." "12-19-50 Paroxysmal auricular fibrillation. pt on quinidine."

Plaintiff herself had testified that her husband had called Dr. Williams in 1948 because "he said that he was positive that he was going to have a heart attack." Plaintiff testified she knew that Mr. Burns had had several electrocardiograms, that he had complained of pains in the chest and that he had an examination because his heart beat faster than usual.

In view of this uncontradicted evidence, there was no issue of fact as to the concealment and misrepresentation. Furthermore, there is no question as to the decedent's knowledge that his answers were false. Plaintiff relies upon her contention that the jury should have been allowed to pass upon the question of whether the facts misrepresented or concealed were material to the risk.

Insurance Code, section 334, provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

Prior to the adoption of the Insurance Code in 1935 this identical language appeared as Civil Code, section 2565, enacted in 1872.

The test of materiality here is a subjective test: the effect which truthful answers would have had upon the insurer. In a number of cases courts have held that where the insurer demands written answers to specific questions, the answers given are deemed material as a matter of law. These include *Cohen* v. *Penn Mutual Life Ins. Co.*, 48 Cal.2d 720, 726 [312 P.2d 241]; *Pierre* v. *Metropolitan Life Ins. Co.*, 22 Cal.App.2d 346, 348 [70 P.2d 985]; *Maggini* v. *West Coast Life Ins. Co.*, 136 Cal.App. 472, 476 [29 P.2d 263]; *Westphall* v. *Metropolitan Life Ins. Co.*, 27 Cal.App. 734, 737 [151 P. 159]; *McEwen* v. *New York Life Ins. Co.*, 23 Cal.App. 694, 697 [139 P. 242]; see *San Francisco Lathing Co.* v. *Penn Mutual Life Ins. Co.*, 144 Cal.App.2d 181, 185 [300 P.2d 715].

In other cases the materiality of the false answers has been treated as a question of fact, even though the matters to be answered in writing were "deemed material." (*California Western States etc. Co.* v. *Feinsten*, 15 Cal.2d 413, 423 [101 P.2d 696, 131 A.L.R. 608]; *Torbensen* v. *Family Life Ins. Co.*, 163 Cal.App.2d 401 [329 P.2d 596]; cf. *Martin* v. *Mutual*

*Benefit etc. Assn.*, 71 Cal.App.2d 557 [162 P.2d 980].)

Where the insurance company concedes or the evidence shows that the company would not have been influenced by full and truthful answers, the falsity of the application has been held not to justify rescission. (*Ransom* v. *Penn Mutual Life Ins. Co.*, 43 Cal.2d 420, 427 [274 P.2d 633]; *Scroggs* v. *Northwestern Mutual Life Ins. Corp.*, 176 Cal.App.2d 300, 302 [1 Cal.Rptr. 189]; *Byers* v. *Pacific Mutual Life Ins. Co.*, 133 Cal.App. 632, 638 [24 P.2d 829]; cf. *Metts* v. *Central Standard Life Ins. Co.*, 142 Cal.App.2d 445, 452 [298 P.2d 621].)

The distinction between the various groups of cases appears to rest upon the nature of the information withheld and what the evidence shows as to the practice of the insurance company when confronted with an application containing a truthful disclosure of the fact which was involved. Such a distinction seems to be required by the clear mandate of the statute.

In the present case the underwriter who reviewed the Burns application testified that he approved it without referring it to the medical department. Had he known about the electrocardiograms, he would not have approved the application until the tracings had been submitted to the medical department. Had the history of chest pains been disclosed, a special heart report and a new electrocardiogram would have been required, and the entire file would have been referred to the medical department for interpretation and recommendation.

Defendant's medical director, Dr. Domm, testified that had the application disclosed the chest pains for which codeine was taken, or the fibrillation for which Mr. Burns took quinidine, or the existence of the electrocardiograms, the company would have required further information, including a special heart report and a new electrocardiogram. Had the investigation indicated to the underwriter that the substernal pain was a significant heart pain, the application would have been rejected. Even for a pain of questionable origin, a standard policy would have been refused and a substandard policy might have been offered in the discretion of the underwriter. Because of a history of a single mild to moderate episode of auricular fibrillation, the company would not have made the contract it made with the deceased. Some of the electrocardiograms taken between 1952 and 1956 showed minor T-wave changes which, according to Dr. Domm, are significant from

an underwriting standpoint, even though they are not significant for clinical purposes. According to defendant's studies there is a higher mortality among persons with minor T-wave changes, and defendant therefore will not issue a standard policy to such persons. The underwriting standards described by Dr. Domm are corroborated by the defendant's underwriting manual, portions of which are in evidence.

Plaintiff offered no direct evidence tending to show that defendant's underwriting standards were other than what defendant showed or that defendant would not have been influenced by full and truthful answers in the application.

Plaintiff produced the testimony of Dr. Rossman, who had examined the deceased, that in August 1956 Mr. Burns was a healthy man and that the electrocardiograms were "within normal limits," meaning that they showed no abnormalities. Plaintiff also called a heart specialist, Dr. Winsor, who testified that the electrocardiograms were normal and that the minor T-wave changes were not evidence of disease. He concluded that from these electrocardiograms he could not make any prediction as to the length of the life of the subject or whether he would die of a heart attack.

Nothing was offered to contradict the testimony of defendant's witnesses that a history of substernal pain and auricular fibrillation requiring relief by medication were material facts. Both of plaintiff's experts agreed with defendant that to determine the physical condition of a person it is necessary to know the truth about his medical history. The misrepresentation in these respects is sufficient to support a rescission of the policy.

Plaintiff argues that the concealment of the electrocardiograms was immaterial, citing *Ransom* v. *Penn Mutual Life Ins. Co.*, 43 Cal.2d 420 [274 P.2d 633]. Although there was ground for rescission without this additional matter, plaintiff's argument deserves an answer. In the *Ransom* case a judgment against the insurance company was affirmed although the applicant had erroneously answered "No" to the question of whether an electrocardiogram had been made. The opinion of the Supreme Court states (at p. 427) : "The electrocardiogram showed that Ransom's heart was 'essentially normal,' and defendant does not claim that this part of the medical history, if known, would have influenced it to consider the risk less desirable."

In the case at bench the insurance company made no such concession. Defendant here has contended throughout that

if the question had been answered in the affirmative it would have made a further investigation, and would not have issued a standard policy on the basis of what would have been disclosed. This contention is supported both by oral testimony and the underwriting manual. The testimony of the medical witnesses was not in substantial conflict on this point. As defendant's medical director, Dr. Domm, pointed out, defendant is not merely concerned with the present health of the individual, but also with determining whether a condition exists which will adversely affect the length of his life. Dr. Domm agreed that in clinical practice these T-waves would be considered normal. He did not claim to be able to predict the length of life of any individual from such tracings. He agreed that many T-wave changes are caused by conditions which have nothing to do with mortality. His underwriting practice was based upon his opinion that among those who have minor T-wave changes there is a greater number of impaired risks than among those who do not have such changes. Since it is impossible to distinguish individual cases a special rating is given to everyone whose electrocardiogram shows these changes.

Dr. Winsor did not say that defendant does not in fact give this special significance to minor T-wave changes. He agreed that some T-wave changes have some effect on mortality. He did not say that it is unreasonable or unscientific or medically unsound for defendant to be influenced by minor T-wave changes in its underwriting practice. Dr. Winsor was very well aware of the difference between what he was talking about and what Dr. Domm was talking about. When plaintiff's attorney questioned Dr. Winsor on this subject, the doctor qualified his answer, thus: "Q. Doctor, based on these electrocardiograms which you looked at here, could you with any reasonable accuracy, any reasonable medical probability, predict how long that patient would live? A. From T-wave changes? Q. Yes. A. No. He might be hit by an automobile tomorrow or pneumonia and I have no way of predicting this." Dr. Winsor, who never saw the deceased, testified simply that the electrocardiograms did have minor T-wave changes, that these changes were "within normal limits," and that from them *he* could not predict whether or when *that man* would die of a heart attack. This testimony does not conflict with defendant's evidence that it is influenced by minor T-wave changes in evaluating insurance risks.

██ Plaintiff argues that the jury might have rejected all of the testimony of defendant's employees as biased, leaving no credible evidence to sustain defendant's burden of proof. However, the proof does not depend entirely on the testimony of defendant's employees. The fact that the questions were asked is at least some evidence that defendant needed the information. (*Cohen* v. *Penn Mutual Life Ins. Co.*, 48 Cal.2d 720, 726 [312 P.2d 241].) Mr. Burns' physician, Dr. Rossman, called by plaintiff conceded that the fact that this series of electrocardiograms had been taken would make him suspicious and indicate the desirability of further checking. This testimony concurs with the directive contained in defendant's underwriting manual to look with suspicion on cases of chest pain "for which serial electrocardiograms or an electrocardiographic exercise test was made." Furthermore the cross-examination of Dr. Rossman developed that on Mr. Burns' electrocardiogram tapes taken after exercise on three different occasions there appeared these notations: "10 steps Vertigo & dyspnea," "dyspnea—mod. & slight beginning substernal oppression," "7 steps dyspnea—stopped at this point." Dr. Rossman conceded that these notations would make him suspicious of a heart condition in the patient, irrespective of whether the tracing appeared normal.

Plaintiff contended in the trial court that those notations were not evidence and should be disregarded because there was no foundation laid as to who made them or when. The significance of the notations is that they existed on the electrocardiogram tapes at the time Mr. Burns made his application. If the applicant had answered truthfully the defendant would have seen the tapes with the notations and, as Dr. Rossman pointed out, the existence of the notations would have aroused suspicion. This is additional uncontradicted evidence, not based upon the credibility of defendant's witnesses, that the false answer regarding electrocardiograms was material.

Since there was no evidence upon which the jury could have found for plaintiff under either issue listed in the pretrial statement, the court properly directed a verdict for defendant.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 23, 1962. Peters, J., was of the opinion that the petition should be granted.