[Civ. No. 21768.   First Dist., Div. One.   June 2, 1965.]

JUANITA F. RUTHERFORD, Plaintiff and Respondent, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant and Appellant.

Donahue, Richards & Gallagher, Joseph T. Richards and George Olshausen for Defendant and Appellant.

Richard D. Sanders, James E. Scott and Stanley K. Dodson for Plaintiff and Respondent.

BRAY, J.†—Defendant appeals from a judgment, after jury trial, in favor of plaintiff for $34,800, and interest, and from an order denying defendant's motion for judgment notwithstanding the verdict.[1]

### QUESTIONS PRESENTED

1. Is defendant estopped from setting up as a defense any concealment or false representations by the insured?

2. Has defendant waived any misrepresentations or concealments in the application for insurance?

### RECORD

On March 12, 1958, defendant executed a policy of insurance, insuring the life of Kenneth G. Rutherford for $34,800. He died of a heart attack on August 17, 1959. Plaintiff, the widow of Kenneth, filed claim for benefits under all the policies issued by defendant on his life. Defendant refused to pay

---

†Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]An order denying a motion for judgment notwithstanding the verdict is appealable. (Code Civ. Proc., § 963, subd. 2; *Taylor* v. *Hawkinson* (1957) 47 Cal.2d 893, 895 [306 P.2d 797].)

on the above mentioned policy, tendering return of premiums paid thereon by the insured. This action followed, resulting in a verdict in favor of plaintiff in the sum of $34,800. Defendant moved for judgment notwithstanding the verdict. The motion was denied.

## EVIDENCE

Rutherford was one of the partners in Ken Motors. He had several policies with defendant: two $500 policies on his life, a $3,000 policy taken to secure a loan and a group (ESP) policy which included a policy on his life. On December 10, 1957, Leo Iacoponi and Web E. Stevens, agents for Prudential, obtained an application from Rutherford for the policy in question. They knew about the other policies issued by defendant to Rutherford. In fact, Iacoponi had sold the $3,000 policy to him and serviced the other policies, collecting the premiums thereon. Stevens filled out the application for the $34,800 policy having the other policies which he mentioned in the application before him. Iacoponi certified that he had known Rutherford and that he was in good health.

On January 9, 1958, Rutherford was examined by Dr. Joseph Libbey, a medical doctor practicing in Antioch, who had examined for Prudential since 1941. The doctor filled out the required questionnaire and gave Rutherford a physical examination. There are two parts to the questionnaire, one requests a medical history, the other the results of the medical physical examination. On the medical history questionnaire there are numerous questions of a technical medical nature. Most of the questions require a "yes" or "no" answer. Dr. Libbey testified in effect that in writing down the answers he would interpret what he thought the applicant meant; that he was not interested too much in detail and if the applicant mentioned something not too serious he might ignore it. Rutherford did not read the questionnaire after Dr. Libbey filled it out, although he signed it. Rutherford received a copy of the application when he received the policy. Dr. Libbey testified that the entire examination of an applicant for insurance customarily takes about 25 minutes, the physical examination occupying less than one-half of that time.

Dr. Marvin Epstein, an internal medicine specialist, testified concerning his treatment of Rutherford from March 4, 1953, until December 12, 1958. In July 1957, Rutherford had been examined by Dr. David J. Dugan for hiatus hernia. There were certain questions on the medical application, the answers

to which were false or incomplete. These follow: Question No. 7a asked if the applicant had ever "applied for or received benefits, compensation, or a pension on account of sickness or injury?" The answer checked was "No." Dr. Epstein's records revealed, however, as did papers from Prudential's files, that before January 9, 1958, Rutherford made a claim to defendant on his group policy for Dr. Epstein's medical services rendered after an automobile accident in 1956, which claim was later paid.

Question No. 7b asked if the applicant had ever "been a patient in or advised to enter a hospital, sanatorium, or other institution for observation, rest, diagnosis, treatment, or any operation?" The answer checked was "Yes" and referred to No. 16 which is to contain the "full particulars" with respect to that answer.

No. 16 sets forth "Fissure in Ano 1954," and states that Rutherford was disabled six weeks, fully recovered in 1954 and his doctor was Dr. Russell Klein of San Rafael; "Hernioplasty—left 1952" disabled six weeks recovered in 1952, and "Hernioplasty—right 1948" disabled six weeks, recovered in 1948, and the doctor was Dr. Virgil Jeans of Joplin, Missouri. No mention was made of Dr. Dugan or of his examination in July 1957 for hiatus hernia, nor of Dr. Epstein and his treatment of Rutherford from March 4, 1953 for shortness of breath, possible stomach trouble, and chest pain. Question No. 8 asked for the names of all doctors consulted by Rutherford in the last five years. The answer referred to No. 16, which was answered as above.

Question 7c asked if there had been any X-rays, electrocardiograms, blood or other medical tests. The answer was "No," although Rutherford had had many X-rays, electrocardiograms, and other tests ordered by Dr. Epstein. Question 7d asked if Rutherford had had any injuries or surgical operations. The answer was "Yes," and apparently referred to Question 16.

Question 9 asked if applicant had been treated for or had a number of specified ailments or conditions. To these the answers were "No": to chest pains (Rutherford had complained to Dr. Epstein of chest pains) ; to ulcers of stomach or intestines or rectal disorders (Dr. Epstein diagnosed possibility of ulcers and Dr. Klein corrected a rectal disorder) ; to gall bladder disorder (Dr. Epstein diagnosed possibility of gall bladder disorder) ; to asthma, chronic cough, spitting of blood and to treatment for lungs or bronchi (10b) (Dr.

Epstein had found chronic cough and bronchitis and treated applicant therefor).

Mr. Oberdick, defendant's senior underwriting consultant, testified that if the application had shown that Rutherford had consulted Dr. Dugan, a chest surgeon; had suffered chest pains and chronic coughing spells; had been treated for a suspected ulcer and a hiatus hernia; and had reported consuming a fifth of alcohol a day, the policy would not have been issued, or the company would have rescinded the contract, the policy permitting rescission for misrepresentation within two years. Oberdick did not underwrite the policy; however, the application was reviewed by Arthur Peeler who was still with the company but who did not testify. Oberdick reviewed the application after Rutherford's death and then rejected the policy.

The assistant manager of debit underwriting division of defendant's actuary department testified that all of the policies issued to Rutherford were part of the records in the case. The testimony showed that defendant has a complete indexing system of its files and electronic equipment to correlate indices.

Defendant's file shows that on February 10, 1958, Dr. Libbey was requested to make an additional examination of Rutherford, to send a specimen of urine and make out a heart form. Both of these should have accompanied the application. The specimen was sent. Apparently the heart form was ''waived'' as the policy was issued in March 1958, and the heart form was not received until September 23. It is unsigned, but filled in in Dr. Libbey's handwriting. A routine and special investigation into Rutherford's alcoholic consumption was conducted by the Retail Credit Company for defendant. Rutherford's application had been reviewed through a policyholder's index of the Medical Information Bureau which had disclosed Rutherford's past drinking habits, but no criticism thereof in the requested report of the Retail Credit Company is shown. Although there is a signed authorization in the application permitting the disclosure of information by any doctor, defendant did not contact the two doctors mentioned in the application.

### The Law as to Life Insurance Policies

█ The general rule is that when an applicant for life insurance is asked for material information about his medical history and he does not give the specific information requested, the insurance company is entitled to void the policy. (Ins.

Code, § 331;[2] Ins. Code, § 10380;[3] *Telford* v. *New York Life Ins. Co.* (1937) 9 Cal.2d 103, 105-106 [69 P.2d 835]; *Cohen* v. *Penn Mutual Life Ins. Co.* (1957) 48 Cal.2d 720, 725 [312 P.2d 241].)

The concealment must be of a *material fact* in order to justify rescission of the policy or to permit the defense of fraud to an action on the policy. (*Ransom* v. *Penn Mutual Life Ins. Co.* (1954) 43 Cal.2d 420, 427 [274 P.2d 633].) Section 334 of the Insurance Code provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

In *Burns* v. *Prudential Ins. Co.* (1962) 201 Cal.App.2d 868, 871-872 [20 Cal.Rptr. 535] the court stated: "The test of materiality here is a subjective test: the effect which truthful answers would have had upon the insurer. In a number of cases courts have held that where the insurer demands written answers to specific questions, the answers given are deemed material as a matter of law. [Citations.]

"In other cases the materiality of the false answers has been treated as a question of fact, even though the matters to be answered in writing were 'deemed material.' [Citations.] Where the insurance company concedes or the evidence shows that the company would not have been influenced by full and truthful answers, the falsity of the application has been held not to justify rescission. [Citations.]

"The distinction between the various groups of cases appears to rest upon the nature of the information withheld and what the evidence shows as to the practice of the insurance company when confronted with an application containing a truthful disclosure of the fact which was involved. Such a distinction seems to be required by the clear mandate of the statute."

As stated in *Torbenson* v. *Family Life Ins. Co.* (1958) 163

[2]Ins. Code, § 331 provides: "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."

[3]Ins. Code, § 10380 provides: "Except as provided in section. 10113, the falsity of any statement in the application for any policy covered by this chapter shall not bar the right to recovery under the policy unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer." (The exception in section 10113 is not pertinent here.)

Cal.App.2d 401, 405 [329 P.2d 596]: "It is not necessary that the misrepresentation have any causal connection with the death of the insured. [Citation.] The question is whether the misrepresentation is such that if the insurer had known the true facts it would have made further inquiries or would have been influenced materially in its decision in accepting the risk."

On the other hand, in *Lyon* v. *United Moderns* (1906) 148 Cal. 470, 475-476 [83 P. 804, 113 Am.St.Rep. 291, 7 Ann.Cas. 672, 4 L.R.A. N.S. 247], quoting from Cooley's Briefs on the Law of Insurance (vol. 3, p. 2594) it was said: " 'From an examination of the cases the following propositions may be regarded as established by the weight of authority: Where the insured, in good faith, makes truthful answers to the questions contained in the application, but his answers, owing to the fraud, mistake, or negligence of the agent filling out the application, are incorrectly transcribed, the company is estopped to assert their falsity as a defense to the policy. The acts of the agent, whether he is a general agent with power to issue policies, a soliciting agent, or merely medical examiner for the company, are in this respect the acts of the company, and he cannot be regarded as the agent of the insured, though it is so stipulated in the application or policy.' " (See also *Boggio* v. *California-Western States Life Ins. Co.* (1952) 108 Cal.App.2d 597, 599-600 [239 P.2d 144] (hearing denied).)

■ This rule applies even where there is an express limitation of the authority of the agent to bind the company. (*Byrd* v. *Mutual Benefit H. & A. Assn.* (1946) 73 Cal.App.2d 457, 463 [166 P.2d 901].)

■ However, the rule above set forth, to the effect that the insurance company is estopped to defend against misrepresentations caused by the negligence of its agent, does not apply where the applicant receives a copy of his application unless some action by the agent prevents the applicant from reading the policy or leads the applicant to believe that the misstated or omitted answers are not material.

In *Telford* v. *New York Life Ins. Co., supra,* 9 Cal.2d 103, 107, the court said: "The courts in this state have adopted the view held by the United States Supreme Court as announced in the case of *Mutual Life Ins. Co.* v. *Hilton-Green,* 241 U.S. 613 [36 S.Ct. 676, 60 L.Ed. 1202]. That and other decisions recognize that the requirement of fair dealing is laid on both parties to the contract. This requirement entails

a duty on the part of the insured to read the contract and the application in accordance with her representations and to report to the company any misrepresentations or omissions. There is no showing in the present case that the failure to read the application was due to any act of the defendant and under the decisions the facts herein do not make an exception so as to excuse the insured's failure to read it. By neglecting to inform the company of the material omissions, the insured becomes responsible for such misrepresentations or omissions.''

In *Layton* v. *New York Life Ins. Co.* (1921) 55 Cal.App. 202, 206-207 [202 P. 958], the court said: ''Where one holds a policy, referring in apt terms to the warranties and representations contained in the application annexed, for a reasonable time, he is conclusively presumed to know the contents of the contract, and the untruthful answers plainly written in the application. He is thereby estopped to assert that he had no knowledge on the subject. [Citation.] Even though the false answers were written by the examiners of the company without the knowledge of the assured, but the latter has the means at hand to discover the falsehood, and negligently omits to use them, he will be regarded as an instrument in the perpetration of the fraud, and no recovery can be had on the policy. [Citations.]''

A study of the authorities indicates that in order to recover on a life insurance policy issued upon an application which contains false answers or omits required information due to the mistake or negligence of the insurer's agent, the applicant must have answered the questions put to him by the agent filling out the application, and must have been so misled by the latter that a reading of the application when received, which the law presumes, although disclosing the errors, would not cause the applicant to believe that the errors were important to the insurer. As said in *Boggio, supra* (108 Cal.App.2d 597, 600), the rule that the insured is presumed to have read the application which he receives and to be aware of any misstatements therein, would not apply unless the insured would know that ''his statements were false in the sense that they withheld information sought to be elicited by the questions contained in the application.'' If the interpretation placed on his answers by the interviewer would have led the insured to believe that the errors in the application were unimportant, then the rule does not apply. Thus, in *Boggio* it was held that the rule did not apply for the reason that, although ''He knew at all times that his

answers were literally untrue'' he did not know ''that they would be deemed untrue by the company in determining whether he was an insurable risk.'' (Pp. 600-601.)

In *Byrd* v. *Mutual Benefit H. & A. Assn., supra,* 73 Cal. App.2d 457, a judgment for the insurance company was reversed because the trial court refused to admit evidence offered to prove that the insured had given truthful and complete information to the soliciting agent and that it was the agent who was responsible for the material omissions on the application form. The insured had signed the application, yet it is noteworthy that while the holding of *Byrd* may not be in actual conflict with *Telford,* and other cases, imposing an obligation on the insured to read the application and inform the company of any misstatements which appear thereon, the court merely states that the insured was not responsible for the conduct of the agent in filling out the application, ''unless he had actual knowledge of the fact that such answer had been improperly or incorrectly written by the agent of the insurer. There is no claim made that the insured had any actual knowledge of the contents of the application, or that he had been asked to read it, or do anything other than sign his name at the end thereof.'' (73 Cal.App.2d 457 at p. 462.)

In *Boggio* v. *California-Western States Life Ins. Co., supra,* 108 Cal.App.2d 597, a judgment for the beneficiary was affirmed although the insured had the application containing the misstatements in his possession. He was not charged with responsibility for the ''fraud, mistake, or negligence'' of the agent, even though the answers were literally untrue, because he had been led to believe by the agent that the questions did not call for the answers he gave orally to the agent. There was evidence that the soliciting agent told the insured: ''Well as long as you do not have a medical discharge they don't care about all this. As long as you have an honorable discharge and not a medical discharge you can sign this application.''

1. *Estoppel.*

In the instant case the record indicates that the circumstances of the answering of the questionnaire by Rutherford were somewhat akin to those in *Boggio.* While Dr. Libbey did not expressly state to Rutherford that his answers were sufficient, a reasonable inference is that he gave Rutherford the impression that the answers the doctor wrote covered all the matters in which defendant was interested, and therefore a reading of the application by Rutherford when he later

received it would not alert him to its insufficiency. The evidence does not indicate that Rutherford was not acting in good faith when Dr. Libbey failed to notify him that the application was not as complete or as accurate as the questions on it intended it to be. The evidence in the case at bench supports the conclusion that the medical examiner did not take the time to explain that information about all X-rays and medical tests, whether routine or not, all complaints about chest pains, coughing spells, severe bloating discomfort, all consultations with and treatement from a physician, whether for "checkups" or otherwise was desired by the insurance company.

There is sufficient evidence to support a finding by the jury that Rutherford was as candid and as truthful as possible to the questions posed by Dr. Libbey as Rutherford understood them, and that any omissions in the application were due to the doctor's carelessness in conducting the examination. In the first place, defendant does not contend, and there is no evidence to support the assumption, that Rutherford had personal knowledge of all the facts contained in Dr. Epstein's records concerning his medical history. For example: In November of 1957 (two months before the medical application form was filled out), Dr. Epstein found that Mr. Rutherford seemed to have a tenderness over his gall bladder. The doctor considered the possibility of a gall bladder disease, cholecystitis, and a recurrent ulcer, and prescribed a low fat diet, Gelusil and Pro-Banthine, which are acid neutralizing drugs, and recommended that the patient give up drinking. He also recommended that Rutherford submit to gall bladder X-rays, although his advice was not followed. The doctor's suspicion of gall bladder disease was never borne out. There is no reason to believe that Rutherford knew that his doctor suspected he had any gall bladder disorder, from the fact that he was given acid neutralizers or from the fact that he was advised to submit to another series of X-rays.

There is no question that the patient himself complained of coughing and spitting up mucus from time to time, but the condition also improved from time to time. A thorough reading of Dr. Epstein's notes tends to establish that as far as he knew in January 1958, Rutherford's difficulties consisted of being overweight, feeling bloated after overeating, gas pains, upper abdominal discomfort and pain, smoking too much, postnasal drip, two past inguinal hernias which had been corrected by surgery, hemorrhoids or fissures in ano

also corrected by surgery, and a hiatus hernia. If he did not eat, smoke or drink too much, Rutherford would report no complaints, except during the periods after two automobile accidents and when he had a cold. He probably knew he had a hiatus hernia since he went to see Dr. Dugan about repairing that condition. He undoubtedly must have been aware of the many X-rays and other medical tests which were taken to aid in the diagnosis of his gastrointestinal condition, and of the injuries suffered after the two automobile accidents. There can also be no doubt that he knew that he had a chronic cough, at least intermittently, if he didn't know that he had bronchitis or bronchoiectasis. There is really no reason to believe that Rutherford was *told* that he had an ulcer or that his doctor suspected an ulcer since the first gastrointestinal series of tests revealed no ulcer and since the ulcer symptoms would appear only periodically. There is even less reason to believe that he knew there had been a possible ''impression'' or diagnosis of prolapsed gastric mucosa, heart disease, chronic gastritis or a liver disorder. Dr. Epstein never could discover anything wrong with his patient's heart aside from the injury caused by the 1956 automobile accident.

As for the method followed by Dr. Libbey when he filled out the medical history questionnaire, the evidence is conflicting, but Dr. Libbey's own testimony does support the inference that he did not spend enough time explaining to the applicant just what was expected of him, *if* the doctor did ask every question on the form. He admitted that he spent only 25 minutes on both the history and physical parts of the examination, that he saw many patients that day, that he did not permit the applicant to read the form before signing it. Although Dr. Libbey was requested to develop any information that might have any bearing on insurability, he treated the examination as merely ''routine,'' and although he knew that medical practice requires at least standard medical tests before operations, and Rutherford had disclosed the operations by Drs. Klein and Jeans, he did not think it was necessary to question Rutherford's answer about X-rays, electrocardiograms and other medical tests. Instead he recorded an answer which concealed that any such tests had ever been taken.

The answers on the questionnaire were conflicting which fact should have required Dr. Libbey to question Rutherford further to clear up the ambiguity. Thus, question No. 7 asking whether Rutherford had ever had ''any X-rays or electrocardiograms, or blood or other medical tests'' the doctor said

Rutherford said, "No," and the doctor so wrote it. (Incidentally when the doctor later questioned him for the "heart form" Rutherford told of an electrocardiogram and of X-rays.) However, Rutherford told of the fissure in ano operation, and in answer to 7b asking if he had ever been in a hospital, sanitarium, etc., he replied that he had, and the doctor wrote "No. 16" which set forth the hernia and fissure in ano operations. Dr. Libbey stated that while Rutherford did not tell him so, the doctor knew that Rutherford had had quite a few tests made in connection with these operations. The doctor wrote no tests, because he thought they were "routine tests." Although the application shows that Rutherford had a rectal disorder, a fissure in ano, Dr. Libbey testified that he didn't think the answer to 9e mentioning rectal disorders should have been "Yes" because the information had already been developed in 8. Questions 7b, 7d, 8, and 9 in all refer to No. 16 which asks for "full particulars with respect to each and every part of Questions 4 through 15 to which the answer is 'Yes'," and yet No. 16 gives the full particulars of only 7b. It is obvious that the medical examiner did *not develop* the full particulars of 7d (injuries or surgical operations), 8 (consulted or been examined or attended by any doctor or other practitioner within the last five years), or 9m (hernia, hemorrhoids, varicose veins, or varicose ulcers). From the way that the examination was conducted, it is inferable that Rutherford was led to believe that the information which the doctor transcribed was as detailed and complete as was demanded by Prudential Insurance Company.

A finding of Rutherford's good faith and belief that he had made complete, thorough and accurate representations to the insurance company is supported by the fact that he gave the name of Dr. Jeans who performed the two hernia operations in Joplin, Missouri, and signed an authorization to any physician, hospital or clinic to give any information with reference to his past medical history. Dr. Jeans had continued to treat Rutherford after the latter moved to California and corresponded with Dr. Epstein and his associate. He knew of Rutherford's many complaints and symptoms as well as Dr. Epstein and, if he had been questioned by Prudential could have given the same information as Dr. Epstein.

In *Boggio* v. *California-Western States Life Ins. Co., supra,* 108 Cal.App.2d 597, the insurance agent made *express representations* as to the materiality of the desired information on which the insured reasonably relied when he signed the appli-

cation with its literally untrue answers. In the instant case, there is no evidence that Dr. Libbey told Rutherford that certain information was not important or that only major illness and operations were intended when "full particulars" were requested. It is reasonably deducible, however, that Dr. Libbey led Rutherford to believe that the insurance company was interested only in operations and serious illnesses by the routine method of conducting the examination. Under such circumstances, the application of the *Lyon* v. *United Moderns* rule is in order as it was in *Boggio*.

The jury could also have reasonably inferred, not only that Rutherford was led to believe that his history as a patient of Dr. Epstein was not material, but that the underwriting department itself did not consider such information material. In *Burns* v. *Prudential Ins. Co., supra,* 201 Cal.App.2d 868, 872, it is stated: "Where the insurance company concedes or the evidence shows that the company would not have been influenced by full and truthful answers, the falsity of the application has been held not to justify rescission. [Citations.]"

The evidence is sharply conflicting on the issue of whether the particular underwriter would have issued the policy if the application had stated that Rutherford had been a patient of Dr. Epstein from 1953 to 1958 in the attempt to obtain relief from chronic coughing, abdominal pains apparently from a hiatus hernia and overweight. Mr. Oberdick testified that the information about an ulcer, hiatus hernia, chest pain and drinking would have had "underwriting significance." Yet he stated that the names of physicians "are needed only when we have to go to get particulars of that condition for which his name is given," and that the name of a physician would have been unimportant when his name was connected with an injury which took place five years before and which the examination (by Dr. Libbey) showed had left "no residuals, no problems, no deformities." This admission served to establish, at least, that the lack of information about the two automobile accidents was *not material*. As we have already noted, it is unlikely that Rutherford knew about any ulcer diagnosis. As for the drinking, defendant apparently did not consider Rutherford's past drinking habits of underwriting significance, for it had full knowledge of them when it issued the policy. Oberdick also made a statement which could justifiably be construed as an admission, or evidence supporting an inference, that the underwriter is interested only in serious injuries and illnesses: "there was no other admission on his

medical report of serious injuries, illnesses; the name of the doctor doing the X-ray would have had no effect on the underwriting.'' This seems to leave the question: Would the underwriters have treated the chronic cough and the hiatus hernia as a serious illness? We conclude that the jury was justified in doubting that he would. Furthermore, as we shall explain *infra,* the underwriter waived the right to such information.

2. *Waiver*

Section 336 of the Insurance Code provides: ''The right to information of material facts may be waived, either (a) by the terms of insurance or (b) by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated.''

There seems to be some confusion in the authorities in California as to whether, where the insurer has information from which it knows or should know that any of the insured's representations are untrue, the insurer is under any duty to investigate to determine whether any other misrepresentations have been made. (In the case at bench, the application, because of the contradictory answers thereto, showed misrepresentation on its face, and defendant had in its underwriting file other data which disclosed other misrepresentations and supplied some missing information.)

*Turner* v. *Redwood Mutual Life Assn.* (1936) 13 Cal.App.2d 573, 577-578 [57 P.2d 222] (hearing denied) held that because the insurer had at its disposal the source from which it could obtain material information which it later claimed was withheld from it, and because it made no investigation, before issuing its policy, the insurer had waived the misstatement in the application. In *DiPasqua* v. *California etc. Life Ins. Co.* (1951) 106 Cal.App.2d 281 [235 P.2d 64] (hearing denied) the insured had given a negative answer in the application to the question for what conditions he had consulted a practitioner or physician in the past five years and if he had been a patient in a hospital other than for an appendectomy many years before. He had in fact consulted several doctors, been hospitalized and subjected to many tests. The insurance company had also conducted an independent investigation through the Retail Credit Company which revealed that he had been hospitalized but that he had no organic illness and was in excellent health. This court held nevertheless that since the insurance company had before it information that plainly indicated that the insured's statements were not true, the company was put upon notice that the insured's answers could not be rea-

sonably relied upon and therefore it had a duty of further inquiry which would have revealed all of the pertinent facts. It is significant that the independent investigation revealed no information which affected the risk. The court imposed a duty of further inquiry on the insurance company, not because material information of underwriting significance was implied from the facts known to the company, but because the falsity of the answers in material respects was implied.

On the other hand, in *Frederick* v. *Federal Life Ins. Co.* (1936) 13 Cal.App.2d 585, 589 [57 P.2d 235], where the insurer knew that the insured's representation concerning prior illnesses was false, the court held that that fact did not require investigation of his other representations and could not constitute estoppel to set up, by way of defense to an action on the policy, the falsity of the other representations. *Maggini* v. *West Coast Life Ins. Co.* (1934) 136 Cal.App. 472, 479 [29 P.2d 263], is to the same effect. There, the only misrepresentation of which the insurer had knowledge was the insured's failure to disclose that some five years prior he had had pneumonia.

In *San Francisco Lathing Co.* v. *Penn M. L. Ins. Co.* (1956) 144 Cal.App.2d 181, 187 [300 P.2d 715], the court said: "Appellant asserts that respondent knowing that one of the assured's answers was incorrect and having discovered one error was bound to investigate the truth of all other statements. It may be conceded that if the insurer had actual notice of the material misrepresentation it could not rescind on the ground of that misrepresentation. (*DiPasqua* v. *California etc. Life Ins. Co.*, 106 Cal.App.2d 281 [235 P.2d 64].) But the insurer with knowledge that one of the applicant's answers is erroneous may, if it chooses, waive that fact and is not thereby estopped from raising other misrepresentations. (*Maggini* v. *West Coast Life Ins. Co.*, 136 Cal.App. 472 [29 P.2d 263].)"

■ A study of these cases dealing with a knowledge by the insurer of the falsity of a statement shows that whether such knowledge requires an investigation of other answers depends upon the type and seriousness of the known misrepresentation. In our case the misstatements were concerning matters serious enough to require investigation.

■ In the instant case the underwriter who acted for defendant in deciding whether or not to issue the policy to Rutherford had information in his underwriting file, before issuing the policy and during the "contestability" period, which put him on notice that the information given by Ruther-

ford or recorded by Dr. Libbey was false and unreliable. The application itself showed that the answers to Nos. 7c and 9e were false. The results of the physical examination disclose that the applicant was overweight, if not obese. The file contains information which indicates that the answer to No. 12 (alcoholism) was false. The heart form indicates that X-rays and electrocardiograph examinations had been conducted, corroborating the falsity of the answer to No. 7c. It is most significant that the heart form was incomplete. That Dr. Libbey did not live up to the instructions of defendant and obtain all the information defendant purportedly desired is indicated by the contradictory answers on the application, the unexplained fact that he did not send in the heart form and obtain the urine specimen required to accompany the application, and that after being notified by defendant to send these in, no heart form appears until September and it is neither dated nor signed by Rutherford or himself, both signatures being required by defendant. The answers on the heart form disclosed that Rutherford had an electrocardiogram in 1944 and chest X-rays in 1953. The doctor did not fill in the space for the name of the doctor in either situation, and testified that he could not recall whether or not Rutherford named the doctor, and that if defendant wanted that information it was customary for it to write and ask the doctor to get it. These facts support the inference that Dr. Libbey was far from meticulous in recording his interviews with Rutherford. The foregoing facts should have put the underwriter on notice that the application form was incomplete and inaccurate in material respects. By failing to request additional information from Dr. Libbey or from Drs. Klein and Jeans the insurance company waived any misstatements or concealments which subsequently appeared to exist in the application.

It does not seem unreasonable for a jury to infer, under the circumstances of this case where the application, by contradictory statements in it, put the insurer on inquiry as to the correctness of the statements, that defendant was willing to accept Rutherford as an insured without further inquiry.

Judgment and order affirmed.

Molinari, Acting P. J., and Sims, J., concurred.

A petition for a rehearing was denied June 25, 1965, and appellant's petition for a hearing by the Supreme Court was denied July 28, 1965.