[Civ. No. 14652.   First Dist., Div. One.   Aug. 24, 1951.]

MARY DiPASQUA, Respondent, v. CALIFORNIA WEST-
ERN STATES LIFE INSURANCE COMPANY (a
Corporation), Appellant.

Peart, Baraty & Hassard for Appellant.

Raymond J. O'Connor and Regis J. Swetmann for Respondent.

AGEE, J. pro tem.—On September 23, 1945, defendant and appellant issued a policy of insurance on the life of Domenico DiPasqua naming his wife, Mary DiPasqua, as beneficiary. The insured was committed as a mentally ill person on January 15, 1947, and was an inmate of Napa State Hospital at the time of his death on January 29, 1947. Judgment for the widow on her complaint, and against the insurance company on its cross-complaint to cancel the policy, followed a nonjury trial.

The cause of death was diabetes. This condition was not known to the insured at the time of the issuance of the policy nor was it found in the two separate medical examinations had by the company prior thereto, although each examination had included an urinalysis. (The condition of diabetes was first discovered in 1946.) In its brief on appeal, appellant states that it "denied liability because of wilful and false answers of insured to a series of questions on applying for the insurance." (App. Op. Br. p. 2.) These answers were made by the insured to two medical examiners for the company and have to do with his medical treatment and condition of health in the period of approximately one year prior to the issuance of the policy.

The company's complaint, specifically, is that the following information was not revealed to it by the insured: from September 12, 1944, to November 16, 1944, Dr. Rosberg saw insured at his office on 13 occasions. His complaints were nervousness, worry, indigestion and fatigue. A series of examinations resulted in nothing being found. The insured then went into the University of California Hospital for four days of observation. Dr. Mattier was the consultant there. Nothing was found. The insured then went back to Dr. Rosberg. At his suggestion, the insured entered St. Luke's Hospital on December 13, 1944, and remained there until December 23, 1944. Another series of tests was made, but again nothing was found. Upon leaving St. Luke's Hospital, the insured asked Dr. Rosberg: "Do you find anything?" and the reply was: "No, we are both leaving this hospital both none the wiser." All of the laboratory tests, including blood and urine, had been negative. The insured was advised

to rest and cut down on the amount of work he was doing. He followed this advice, and the record supports the finding that he was in good health at the time of the issuance of the policy.

The first medical examination for the insurance company was by Dr. Apostolides on August 16, 1945. The regular medical examiner for the company was away at the time. Question 18 was: "For what conditions have you consulted a physician or other practitioner within five years?" The answer of the insured was: "None." However, in answer to Question 16: "What illness, disease, accidents or operations have you ever had and for what conditions have you consulted a physician?", the answer included "history of vertigo a year ago—diagnosed as overwork." Dr. Apostolides testified: "Q. Did he give you a history of having been examined by other doctors the year before? A. He said he had doctors, and I don't remember, he gave me a history of what the doctors told him. Q. You didn't put down the names of any doctors? A. No."

On August 23, 1945, Dr. Dunn, the regular medical examiner for the company, examined the insured. DiPasqua again answered, as he had on the previous examination, that he had not been a patient in any hospital except for an appendectomy many years before. In answer to Question 18, however, he stated: "For overworked condition." Question 23 was: "Have you now, or have you ever had a nervous breakdown, etc.?" The answer was: "In 1944 I had asthenic condition caused by overwork, and was advised to take a vacation for two weeks; good recovery. No pathology found." The answer to Question 16 included: "asthenia in 1944 for two weeks—Dr. Gottschalk." This doctor had been consulted by the insured shortly before he went to Dr. Rosberg.

"Asthenia" was described at the trial as being the term used when a patient complains of being tired and worn out, has loss of appetite, and is not able to sleep.

Prior to either of the two medical examinations, the insurance company had ordered and obtained an investigation report from the Retail Credit Company. This report was in writing and contained the following: "He had suffered from overwork about six months before and had been confined to U. of C. (University of California) Hospital and was confined there, taking tests; that it was learned that he had no organic illness but his trouble was only caused from overwork and worry; that he was now in excellent health."

On January 13, 1947, respondent signed a petition that the insured was mentally ill and that the "first symptoms of mental disturbance occurred about two years ago." The commitment to Napa State Hospital followed. There is no evidence that the insured ever knew or realized that he was mentally ill.

Respondent's counsel makes an able argument that there was no concealment or withholding by the insured, that he did not consider his brief hospital stays in 1944 as being a patient in a hospital because it was merely for observation and examination, and nothing pathological was found. ■ However, the fact is that material information was not given to the company in response to their direct questions. Ordinarily, this would entitle the company to avoid the policy. (Ins. Code, §§ 330, 331 and 334.) Section 334 provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

In response to Question 20, the insured answered each time that he had not been a patient in any hospital except for an appendectomy many years ago, when, in fact, he had been a patient in two hospitals within the past year.

■ Prior to both medical examinations the insurance company had before it a written report obtained by it from an independent source which plainly stated that the insured's answer in response to this very vital and material question was not true. It had in its possession an authorization signed by the insured to obtain any medical information pertaining to him. It would not have been unreasonable or difficult for the company to have contacted the University of California Hospital and thus would have ascertained the truth. This would have revealed the fact that the insured *had* been a patient there within recent months and that, what is of vital importance, the insured was either deliberately lying and concealing material facts, or that he was not a responsible person capable of correctly stating the facts. The company was put upon notice prior to issuance of the policy that the answers of the insured could not reasonably be relied upon. We believe that under such circumstances the company had a duty of further inquiry and that such inquiry would have fully revealed all of the pertinent facts. ■ In other words, the insurance company cannot rely solely upon the insured's answers in his application where it conducts an independent

investigation which reveals the falsity of such answers in material respects. The trial court expressly found that the company did not rely upon the statements of the insured, "but on the contrary, conducted an independent investigation of its own to discover the truth or falsity of the answers made by Domenico T. DiPasqua to the questions contained in said application for life insurance." After reciting the result of such investigation, the findings continue: "that despite the knowledge of the falsity, if any, of the said Domenico T. DiPasqua's statements in failing to make such disclosure, to said defendant, said defendant, with knowledge of the falsity of said answer, or the inadvertence and mistake of Domenico T. DiPasqua to reveal such information, said defendant issued said life insurance policy on or about September 17th, 1945." These findings are supported by the record. As was said in *Weir* v. *New York Life Ins. Co.*, 91 Cal.App. 222, at page 226 [266 P. 996]: ". . . the conclusion is irresistible that the company did know that some of the applicant's representations were untrue, and that it issued the policy for a reduced amount in spite of that fact." The point there involved was the insured's answer that he only drank a moderate amount of wine. He died three months and ten days after the issuance of the policy, with alcoholism being a material cause of death. The company knew of his addiction to alcohol prior to issuance of the policy.

Since, as we have held, the company could not reasonably rely upon the answers of the insured referred to above, it follows also that it could not rely upon the failure of the insured to advise it of any errors or omissions in the application after the policy with attached photostatic copy of the application had been received by him.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 22, 1951. Spence, J., voted for a hearing.