[No. A108553. First Dist., Div. One. Aug. 25, 2005.]

WEST COAST LIFE INSURANCE COMPANY, Plaintiff and Respondent,
v.
STEPHEN R. WARD, Defendant and Appellant.

**COUNSEL**

Law Offices of Robert J. Khan and Robert J. Khan for Defendant and Appellant.

Seyfarth Shaw, Peter E. Romo, Jr., and Nicole C. Zappala for Plaintiff and Respondent.

**OPINION**

**SWAGER, J.**—Stephen R. Ward appeals a declaratory judgment to the effect that West Coast Life Insurance Company (WCL) properly rescinded a life insurance policy covering the life of his wife, Lois Ward, after receiving a claim for payment following her death. We affirm.

## PROCEDURAL BACKGROUND

The declaratory judgment action concerned two inaccuracies in the application dated August 19, 2002, which Lois Ward submitted to WCL for a life insurance policy. Question No. 7 of the application asked if the "proposed insured" had any application for other life insurance then pending. The applicant responded: "No." Question No. 14 asked for life insurance "in force and pending" on the proposed insured. The application did not disclose any in-force policies but listed pending insurance coverage with CNA and Jackson National, each in the amount of $1 million.

WCL issued a policy to Lois Ward on October 3, 2002, naming Stephen Ward as beneficiary. She died on December 12, 2002, somewhat more than two months later. After receiving a claimant's statement from Stephen Ward, WCL rescinded the policy on the ground that the insurance application contained material misrepresentations about other insurance in force and tendered a check for the amount of all premiums paid plus interest. On September 11, 2003, WCL filed a complaint for declaratory relief seeking a declaration that the policy was "duly rescinded and is null and void and of no further force or effect." Following discovery, it filed a motion for summary judgment, which the trial court granted. Stephen Ward (hereafter Stephen or appellant) now appeals from the summary judgment.

To review the issue of misrepresentation, we must first examine the record pertaining to insurance coverage of Lois Ward (hereafter Lois). The record discloses that at the time she applied for the WCL policy on August 19, 2002, Lois had three insurance policies providing a total of $2.9 million in coverage. American Republic Life Insurance Company issued her a policy on February 10, 1992, in the amount of $400,000 and Northwestern Mutual Life Insurance Company issued her a policy on September 16, 1996, in the amount of $500,000. Both policies were still in effect on August 19, 2002.

A third policy came into force shortly before Lois submitted the WCL application. According to Stephen, he and his wife decided they wanted to increase the amount of life insurance on each of their lives in July 2002, and they each submitted two separate applications through an insurance agent named Bruce Goldsmith for $2 million of life insurance coverage. One of these applications submitted by Lois was to Transamerica and was dated and delivered to Goldsmith on July 31, 2002. Stephen executed a check for the first policy premium of the Transamerica policy on August 14, 2002. Lois received the policy and signed a delivery receipt on August 19, 2002, the same day that she submitted the WCL application.

On August 2, 2002, Lois and Stephen met with another agent, William Wee, who acted as a writing agent for a general agent, Capital Synergies. Wee advised them to apply to several companies for coverage and select the one that would offer the best rates. Accepting this advice, Lois applied to WCL, Jackson National, and CNA for separate life insurance policies in the amount of $1 million each. Stephen testified that Wee filled out and completed an application to WCL dated August 19, 2002, and "dropped it off" at their home or Stephen's office on that same day. The record reveals that Lois signed the application bearing that date and that it was received by WCL "shortly" thereafter. The application was for a 10-year term policy with coverage of $1 million. Lois was then 46 years old. Though the policy was dated October 3, 2002, the chief underwriter for WCL testified that it actually went into effect on October 29, 2002, when all the conditions for its issuance were satisfied.

In the course of processing Lois's application, WCL employed First Financial Underwriting Services, Inc., to investigate the application. The firm prepared a report that was dated September 9, 2002. The WCL underwriting department logged the receipt of the report on September 13, 2002. According to the chief of the WCL underwriting department, the report would have been reviewed as a matter of routine by the employee assigned to the application. In this appeal, appellant emphasizes that, under the heading "other insurance in force," the report stated, "Applicant has a policy with Northwest Mutual in the amount of $500,000." Appellant also produced evidence that at this time the writing agent, William Wee, had copies of Lois's Transamerica application.

The application that Lois submitted to Jackson National also led to issuance of a $1 million insurance policy. The record reveals only two pertinent facts about the chronology of this coverage: the insurer received the application on August 28, 2002, and WCL apparently had not learned of the insurance coverage on September 9, 2002, the date that the report was prepared.

While the WCL application for a $1 million policy was pending, Lois requested an increase in coverage to $2 million. WCL maintains that it "only agreed to increase [her] coverage from $1 million to $2 million on the representations on [her] behalf that she would cancel the one Jackson National policy of which WCL was aware." Stephen denies that either he or his wife ever represented that they would cancel the Jackson National policy and points to the absence of any written representation of this sort. The

record, however, discloses that Lois and her agent, Wee, both signed and sent to Capital Synergies a "replacement form" relating to the substitution of WCL coverage for that of Jackson National. Internal documents of both WCL and Capital Synergies reveal an assumption that Lois had agreed to replace the Jackson National policy with the $2 million WCL coverage. Before action was taken on this request, Lois asked for a further increase in coverage to $3 million. WCL approved in principle the increase to $2 million and then to $3 million. Nevertheless, WCL claims that neither the $2 million nor $3 million increase in coverage went through the necessary steps to go into effect. In this appeal, Stephen claims only coverage by the $1 million policy.

In its statement of undisputed facts, WCL maintains that it "would not have issued any insurance on [Lois's] life if it had known she already had $2.9 million in insurance . . . ." And, again, if it had known as of October 2002, that she "had in force $4.9 million of insurance . . . it would not have agreed to insure her or increase her insurance coverage." At his deposition, Steven Hetherington, the chief underwriter of WCL, was questioned concerning WCL's willingness to approve a $3 million insurance policy for her. Hetherington insisted, "It was our absolute outside number." WCL possessed guidelines for its underwriting practices, entitled "Guide to Initial Underwriting Requirements," which it distributed to insurance agents for their use. The financial underwriting section of this document stated that personal insurance of insureds between the ages of 41 and 50 should not exceed 12 times earnings. Lois's application listed annual income of $120,000 plus. The report of First Financial Underwriting Services, Inc., reported only the couple's joint income as being $350,000.

## DISCUSSION

Stephen challenges the judgment of rescission on the ground that the record presents a triable issue of waiver under Insurance Code section 336[1] and two early precedents from this court, *Rutherford v. Prudential Ins. Co.* (1965) 234 Cal.App.2d 719 [44 Cal.Rptr. 697] and *DiPasqua v. California etc. Life Ins. Co.* (1951) 106 Cal.App.2d 281 [235 P.2d 64]. We will review the general principles governing rescission and then consider the issue of waiver.

■ The rule in insurance cases is that a material misrepresentation or concealment in an insurance application, whether intentional or unintentional,

---

[1] All further statutory citations will be to the Insurance Code unless otherwise indicated.

entitles the insurer to rescind the insurance policy *ab initio*. (*O'Riordan v. Federal Kemper Life Assurance* (2005) 36 Cal.4th 281, 286–287 [30 Cal.Rptr.3d 507, 114 P.3d 753]; *Barrera v. State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659, 665, fn. 4 [79 Cal.Rptr. 106, 456 P.2d 674].) *Wilson v. Western National Life Ins. Co.* (1991) 235 Cal.App.3d 981, 994 [1 Cal.Rptr.2d 157].) The rule has been codified in express provisions of the Insurance Code that place heavy burdens of disclosure upon both parties to a contract of insurance and permit rescission for a failure to provide requested information. (*Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 179–180 [243 Cal.Rptr. 639].) Thus, section 331 provides: "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance." Concealment is defined in section 330 as "[n]eglect to communicate that which a party knows, and ought to communicate." Section 332 states more clearly the requirement of materiality: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract . . . ." (See also §§ 334, 359, & 360.)

■ "Materiality is determined solely by the probable and reasonable effect which truthful answers would have had upon the insurer." (*Thompson v. Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 916 [109 Cal.Rptr. 473, 513 P.2d 353]; see *Freeman v. Allstate Life Ins. Co.* (9th Cir. 2001) 253 F.3d 533, 536.) Section 334 explicitly provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

■ " 'The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law.' [Citation.] [¶] 'Other cases, however, inquire into the nature of the information withheld, and the likely practice of the insurance company had the concealed facts been truthfully disclosed. . . .' [Citations.]" (*Old Line Life Ins. Co. v. Superior Court* (1991) 229 Cal.App.3d 1600, 1603–1604 [281 Cal.Rptr. 15].) The test is a subjective one; "the critical question is the effect truthful answers would have had on [the particular insurer], not on some 'average reasonable' insurer." (*Imperial Casualty & Indemnity Co. v. Sogomonian, supra*, 198 Cal.App.3d 169, 181.)

■ A summary judgment of rescission may be properly granted for the insurer where the only reasonable inference to be drawn from the undisputed evidence presented is that "the false negative answers and omissions of [the

applicant] were material to [the insurer's] decision to provide insurance coverage." (*Imperial Casualty & Indemnity Co. v. Sogomonian, supra,* 198 Cal.App.3d 169, 182; see also *Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 827 [44 Cal.Rptr.2d 56]; *Wilson v. Western National Life Ins. Co., supra,* 235 Cal.App.3d 981, 995–996.) ■ As in other cases, a plaintiff is entitled to summary judgment if he "has proved each element of the cause of action entitling [him] to judgment on that cause of action." (Code Civ. Proc., § 437c, subd. (p)(1).) Once the plaintiff has made this evidentiary showing the burden shifts to the defendant who must "set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ." (*Ibid.*; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

In this appeal, appellant does not contest the trial court's ruling that Lois's failure to disclose other current insurance policies in her application was material to WCL's decision to issue the policy but instead relies entirely on a theory of waiver. The statutory basis for waiver is section 336, which provides in pertinent part: "The right to information of material facts may be waived, . . . by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated."

The factual basis for appellant's claim of waiver rests on evidence that, before issuing the insurance policy in question, WCL received information through First Financial Underwriting Services that Lois's response to question No. 14 contained an omission; it failed to list an in-force insurance policy of Northwestern Mutual Life Insurance Company in the amount of $500,000. Appellant also notes that the face of the insurance application displayed an inconsistency between the answers to question No. 7 and question No. 14. The former answer denied the existence of pending insurance policies while the later answer listed two pending insurance policies. These discrepancies, appellant argues, implied that the answer to question No. 14 was in error and should have prompted WCL to inquire as to the actual facts. Instead, the insurer issued the $1 million policy and later approved in principle increases in coverage to $2 million and then $3 million.

Appellant suggests that WCL could easily have discovered the existence of the $2 million Transamerica policy because the writing agent, William Wee, possessed a copy of the policy. Appellant appears to concede, however, that Wee acted solely as the insureds' agent in dealing with the general agent, Capital Synergies, and therefore his knowledge would not be imputed to WCL. The record contains no evidence that Capital Synergies possessed information of the undisclosed policies.

Our analysis of appellant's claim of waiver begins with the concept of materiality. We see significance in the fact that it was the *total amount* of other policies that was material, not the existence of a single policy with $500,000 coverage. Hetherington testified that $3 million would have been the "outside limit" of insurance for which Lois would have qualified under WCL's underwriting guidelines reflected in its "Guide to Initial Underwriting Requirements." With other coverage of $2.9 million, the issuance of a $1 million policy to Lois would have caused her insurance to exceed this limit and to violate the company's underwriting guidelines. In contrast, the existence of a single policy of $500,000 did not implicate the underwriting guidelines and was not material to WCL's decision to issue the policy.

Since the existence of the $500,000 policy was not in itself material to WCL's decision to issue the policy to Lois, the question becomes whether the discovery of this immaterial omission implied the existence of other material nondisclosures. We think the answer is surely no. Communication of information regarding an *immaterial* omission of a $500,000 insurance policy, which WCL gained from the report, did not imply the existence of a *material* omission, i.e., the existence of other insurance that in total exceeded WCL's underwriting guidelines. Similarly, the failure to list pending policies in answer to question No. 7 did not imply the existence of distinct material omissions regarding in-force policies in answer to question No. 14.

We find *Old Line Life Ins. Co. v. Superior Court, supra,* 229 Cal.App.3d 1600, to be instructive. The insured was a heavy cigarette smoker who purchased a nonsmoker's life insurance policy through an insurance broker. The practice of the insurance company was to deny a nonsmoker's policy to persons who smoked cigarettes during the 12 months preceding the date of application. The smoking of cigars and pipes did not disqualify an applicant for a nonsmoker's policy, but the insurance application still questioned applicants about current use of cigars and pipes to " 'avoid needless suspicion' " in the event " 'a urine or blood test indicate[d] the presence of tobacco by-products.' " (*Id.,* at p. 1603.)

The insured falsely indicated on her life insurance application that she had not smoked cigarettes during the past 12 months and also stated that she did not " 'currently smoke pipes or cigars.' " (*Old Line Life Ins. Co. v. Superior Court, supra,* 229 Cal.App.3d 1600, 1602.) After receiving her completed application, the insurance broker also gave her a "Non-Smoking Declaration" to fill out. Contradicting the application, she checked "I do" after a question inquiring whether she smoked pipes or cigars. It was undisputed that the

broker did not send the declaration to the insurance company until after her death of cancer about a year and a half after issuance of the policy.

The insurance company sought to rescind the insurance policy. When the trial court denied its motion for summary judgment, it sought a writ of mandate to reverse the order denying summary judgment. The appellate court issued the writ on the ground that the insured's false denial of smoking cigarettes in her application was a material misrepresentation entitling the insurance company to rescission. The portion of the decision discussing the inconsistent nonsmoker's declaration is most relevant to the present case. The court found that the insurance company "had no direct information that [the insured] smoked cigarettes," thus implicitly recognizing that the broker was not its agent, and it attributed no significance to the speculative possibility that the insurance company might have learned of the inconsistent nonsmoker's declarations through the broker and then initiated a broad investigation of the applicant's smoking. (*Old Line Life Ins. Co. v. Superior Court, supra,* 229 Cal.App.3d 1600, 1607.) The court observed that, "even if [the insured] was a current smoker of pipes and cigars, she would have been entitled to a nonsmoker's policy." (*Ibid.*) Hence, even if the insurance company discovered the inconsistent declaration, the discovery would not fall into the category of "obvious leads" that should lead the insurance company to make inquiries or suffer waiver under section 336. (229 Cal.App.3d at p. 1606.)

WCL cites two earlier decisions for the proposition that discovery of a minor error in an application does not necessarily put the insurer on notice of a material misrepresentation. In *S. F. Lathing Co. v. Penn M. L. Ins. Co.* (1956) 144 Cal.App.2d 181 [300 P.2d 715], the insured died of a heart attack within two months of issuance of a life insurance policy. His application contained several material omissions with respect to health history and incorrectly stated that he had X-rays of his lungs in 1945, which were in fact taken in 1948. The insurance company possessed an earlier application for a different policy that gave the correct information regarding the date of the X-rays.

The court held that the insurance company's presumed knowledge of the erroneous X-ray dating did not put it on notice of other material omissions in the application: "the insurer with knowledge that one of the applicant's answers is erroneous may, if it chooses, waive that fact and is not thereby estopped from raising other misrepresentations. [Citation.] . . . [T]he insurer may well have regarded the mistake in date [of the X-rays] as an uninten-

tional fault of memory and regarded it as unimportant. It cannot be held to have put the insurer on notice that the insured was deliberately concealing other material facts." (*S. F. Lathing Co. v. Penn M. L. Ins. Co., supra,* 144 Cal.App.2d 181, 187.)

Similarly, in *Maggini v. West Coast Life Ins. Co.* (1934) 136 Cal.App. 472 [29 P.2d 263], the insured, who died of pneumonia, falsely denied a history of respiratory illness in his application, but the insurance company possessed a report from a retail credit company relating to an earlier application that revealed one particular omission—the insured had received medical care for pneumonia five years earlier. The court held that the insurance company was not estopped to assert fraud: "This [knowledge of pneumonia five years earlier] may have been sufficient to raise a suspicion as to the truth of other representations relied on; but cause for suspicion does not constitute knowledge." (*Id.* at p. 479.)

Of the two decisions on which appellant relies, *Rutherford v. Prudential Ins. Co., supra,* 234 Cal.App.2d 719, provides a good illustration of the proper application of section 336. The insured purchased a policy from an agent of the insurance company and received a medical examination by a physician employed by the company. The physician filled out a medical questionnaire in the insurance application and asked the insured to sign it without giving him an opportunity to read the answers provided. Though there was no evidence that the insured misled the doctor, the questionnaire failed to report important information about the insured's medical history, particularly as it concerned heart disease. Later, the doctor was asked to make an additional examination and to fill out a "heart form." The form as completed contained disclosures not found in the questionnaire, but the insurance company issued the policy before actually receiving the form from the doctor. The insured died of a heart attack a little more than a year after the policy was issued.

Affirming a judgment for the insured's beneficiary, the court found that the insurance company possessed information indicating that the application was materially inaccurate and incomplete in reporting the insured's heart disease and it waived the deficiencies in the application by failing to make further inquiries. The "heart form" in possession of the company's physician reported that X-rays and electrocardiograph examinations had been conducted, though the application did not reveal this information. The physical examination itself disclosed that the applicant was overweight; the insurer's file contained information about his alcoholism. Moreover, the doctor's failure to sign or procure the insured's signature to the "heart form," to identify the

physicians who had conducted tests mentioned in the form, and to submit the form in a timely manner indicated that he was "far from meticulous in recording" his examinations and "should have put the underwriter on notice that the application form was incomplete and inaccurate in material respects. By failing to request additional information from [the examining physician] or from [the physicians who ordered X-rays and an electrocardiogram] the insurance company waived any misstatements or concealments which subsequently appeared to exist in the application." (*Rutherford v. Prudential Ins. Co., supra,* 234 Cal.App.2d 719, 735.)

In *DiPasqua v. California etc. Life Ins. Co., supra,* 106 Cal.App.2d 281, the insured underwent two medical examinations and "answered each time that he had not been a patient in any hospital except for an appendectomy many years ago." (*Id.* at p. 284.) In response to questions asking about consultations with a physician, he replied inconsistently "none" and that he had consulted a physician for conditions " 'diagnosed as overwork. ' " (*Id.* at p. 283.) The insurer, however, received a report from its investigator revealing that in the previous year he had been confined to the University of California Hospital to take tests and had " 'suffered from overwork.' " (*Ibid.*) The evidence showed that he had in fact been hospitalized twice in the past year for complaints of "nervousness, worry, indigestion and fatigue." (*Id.* at p. 282.) The laboratory tests conducted during the two periods of hospitalization were negative, and he was advised to rest and reduce the amount of work he was doing. About a year and a half after issuance of the insurance policy, he died of diabetes while confined in a mental hospital.

Affirming a judgment for the insured's widow, the court held that the insurance company waived misrepresentations of material information on the application by failing to investigate contradictory information received from its investigator: "the insurance company had before it a written report obtained by it from an independent source which plainly stated that the insured's answer in response to this very vital and material question [previous hospitalization] was not true. . . . The company was put upon notice prior to issuance of the policy that the answers of the insured could not reasonably be relied upon. We believe that under such circumstances the company had a duty of further inquiry and that such inquiry would have fully revealed all of the pertinent facts." (*DiPasqua v. California etc. Life Ins. Co., supra,* 106 Cal.App.2d 281, 284.)

■ We consider that this review of the case law confirms our initial reading of the statutory language. Section 336 provides that an insurance company waives disclosure of material facts in an application where the facts are "distinctly implied" by other information communicated to it and the company fails to make "inquiries as to such facts." Here, WCL received

information of one other insurance policy that was of an amount well below its underwriting limit for an applicant's other insurance coverage. We do not think this information can reasonably be construed to imply other undisclosed insurance policies exceeding its underwriting limits.

█ The decisions in *Old Line Life Ins. Co.* and *S. F. Lathing Co.* stand for the sound principle that information regarding an immaterial error does not imply material omissions in the insurance application. The older decision, *Maggini*, is perhaps questionable on its facts since the undisclosed condition—pneumonia five years earlier—might reasonably be regarded as having a significant causal connection with the insured's later death of pneumonia, but we can agree with the court's statement that "suspicion as to the truth of other representations" in an application is not enough to result in a waiver under section 336. (*Maggini v. West Coast Life Ins. Co., supra,* 136 Cal.App. 472, 479.)

In *Rutherford* the court considered the application itself, the report of an investigator, and information in the "heart form" in possession of the insurer's agent, the examining physician. The pertinent items in these sources of information, considered together, implied the existence of a material omission in the application, i.e., a failure to accurately report a history of heart disease. In contrast, the information that WCL received from its investigator indicated only omission of information concerning one insurance policy that did not itself implicate, or come close to implicating, the insurer's underwriting guidelines.

*DiPasqua* unquestionably contains language supporting appellant's argument. The court found that the insurer possessed information suggesting the unreliability of the insurance application. Appellant argues that the inconsistency in reporting pending insurance and the omission of one policy of in-force insurance similarly suggested the unreliability of Lois's application in the present case. But *DiPasqua* must be read in its factual context. The information of a hospitalization within the previous year, which the insurer received from its investigator, was of such vital importance as to put the insurer on notice of the omission of material facts relating to the insured's medical history. In contrast, the information of one insurance policy omitted from the application did not itself put the insurer on notice of further, more significant omissions, which would in combination implicate the insurer's underwriting guidelines.

We conclude that WCL did not waive Lois's concealment of a material amount of other in-force insurance in response to question No. 14 of the insurance application.

## DISPOSITION

The judgment is affirmed.

Marchiano, P. J., and Stein, J., concurred.