[No. B213664. Second Dist., Div. One. Mar. 23, 2010.]

GEVORK NAZARETYAN et al., Plaintiffs and Appellants, v.
CALIFORNIA PHYSICIANS' SERVICE, Defendant and Respondent.

1602

**COUNSEL**

Shernoff Bidart Darras Echeverria, William M. Shernoff, Joel A. Cohen, Evangeline F. Grossman; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Appellants.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Brad Seiling, Joanna S. McCallum and John T. Fogarty for Defendant and Respondent.

**OPINION**

**ROTHSCHILD, Acting P. J.**—In 2004, plaintiffs Gevork Nazaretyan and Narine Ghazaryan applied for and obtained health coverage from defendant California Physicians' Service, doing business as Blue Shield of California (Blue Shield), a health care service plan. In 2006, Blue Shield rescinded plaintiffs' coverage on the ground that their application contained several material misrepresentations concerning their medical history. Plaintiffs then filed suit against Blue Shield but lost on summary judgment. We reverse.

## BACKGROUND

Nazaretyan immigrated to the United States from Armenia when he was 11 years old, and he never finished high school. Ghazaryan is Nazaretyan's wife; she came to the United States from Armenia in 1999. When she arrived she spoke no English, having studied only Armenian and Russian. She now understands English "[u]p to [a] certain point," which she estimates to be "[p]erhaps 40 percent."

In August 2004, plaintiffs had health insurance through a Blue Cross HMO (health maintenance organization) plan. Because their coverage was restricted to the HMO's "in-plan" doctors, they sought a plan that offered broader coverage.

Ahmad Yusop was an insurance broker selling products offered by various insurance companies and health care service companies, including Blue

Shield. In the past he had assisted plaintiffs in obtaining other insurance (health, life, and disability) from companies other than Blue Shield, and he had completed other insurance applications for them.

On August 31, 2004, Yusop met with plaintiffs at their home to assist them in obtaining new health coverage and to fill out an application for Blue Shield coverage. When Yusop had sold them their prior health coverage, he had also come to their home and completed the applications.

At the meeting on August 31, 2004, Yusop sat across from Nazaretyan, who did not see what Yusop was writing. Yusop completed the application, and, except for the signatures, all of the handwriting on the application (including the dates next to the signatures) is his. Yusop did not show the application to plaintiffs; he simply handed them the signature pages to sign. He did not show them the completed application or give them an opportunity to review it for accuracy. Nazaretyan testified that Yusop did not read to them the health-related questions on the application but instead asked only the date of Ghazaryan's last menstruation, whether Ghazaryan drank or smoked, and whether there had been a "significant change" in their lives.[1] Nazaretyan also testified that Yusop told them he would copy certain necessary information from a previous application that Yusop had submitted to Blue Cross on plaintiffs' behalf.

On September 10, 2004, Blue Shield sent Yusop a form requesting certain missing information, indicating that plaintiffs' August 31 application failed to state the type of plan for which they were applying and the nature and date of Nazaretyan's last physician visit. (The application stated that Ghazaryan's last physician visit was for a "regular physical check-up" with Dr. Chang on Apr. 20, 2004.) Blue Shield also returned plaintiffs' application to Yusop without having submitted it to the underwriting department.

On September 21, 2004, the missing information form was returned to Blue Shield with the questions answered, stating the name of the plan for which plaintiffs were applying and indicating that Nazaretyan's last physician visit was an emergency room visit concerning an ear infection. Blue Shield contends it is undisputed that plaintiffs "responded directly," rather than through Yusop, to the request for missing information, but plaintiffs dispute the contention and state that, "beyond the document itself," there is no evidence that plaintiffs "responded directly." The completed form bears what

---

[1] Ghazaryan testified that in addition to asking "when is your menstruation date" Yusop asked "if we had gone to any hospital, if we had any illnesses, I mean like heart problem or diabetes," and "[i]f we were using any medicine." But it is unclear from the deposition excerpt in the record whether Ghazaryan was referring to the August 31 meeting or some other meeting with Yusop.

appears to be Nazaretyan's signature, and the handwritten response concerning the physician visit contains the following: "Date? I can't find my bills. This year some time."

On October 12, 2004, plaintiffs resubmitted their application to Blue Shield. Ghazaryan's menstruation date was updated, the application stated the plan for which plaintiffs were applying and also the date and nature of Nazaretyan's last physician visit (described as an "ears check-up" in 2003), and there were new signature pages, but otherwise the application appears to be the same one that was submitted in August (e.g., it shows Ghazaryan's previous menstruation date struck out and replaced by the new date).

On the basis of the information in plaintiffs' applications, Blue Shield approved plaintiffs for coverage at the most favorable rate on November 1, 2004. On May 17, 2005, Ghazaryan gave birth prematurely to twin girls. The notes of Blue Shield's "medical management unit" dated May 19, 2005, state that the twins were the "product of IVF," i.e., in vitro fertilization.

On or about November 11, 2005, plaintiffs' case was referred to the Blue Shield department that investigates potential material misrepresentation or nondisclosure of medical history by Blue Shield subscribers. The department was formerly known as the "underwriting investigations unit" but is now called the "eligibility review unit" (ERU).

In the course of its investigation, the ERU requested and obtained medical records from Ghazaryan's obstetrician, Dr. Arslanian. The records revealed that Ghazaryan was being treated for infertility and was beginning IVF treatments in 2004 and also had undergone a "D&C procedure" for a spontaneous abortion in October 2002 and October 2004. The ERU also learned from Ghazaryan (through counsel) that she had undergone IVF treatment at the Pacific Fertility Center. The ERU then obtained records from the Pacific Fertility Center, which showed that on October 12, 2004, Ghazaryan was seen there for an infertility evaluation and was scheduled for the various steps of the IVF procedure, stretching from October 18 into November. In discovery during this litigation Blue Shield learned from a number of sources, including additional medical records and Nazaretyan's deposition testimony, that in 2002 plaintiffs had undergone fertility treatment including IVF and that their second round of IVF treatment began on August 17, 2004, before they first applied to Blue Shield.

There were several places on the application where plaintiffs should have disclosed their previous and ongoing infertility treatment, but they did not do so. For example, question 8.A in part 4 of the application asked whether they had "EVER received any professional advice or treatment" pertaining to

"in-vitro fertilization" and whether "the applicant or spouse" is "currently being treated for infertility." Plaintiffs answered "No" both times they submitted their application, but Nazaretyan admitted at his deposition that the answer should have been "Yes." Had plaintiffs disclosed that they were being treated for infertility, Blue Shield would not have issued coverage for them.

On March 24, 2006, Blue Shield sent plaintiffs a letter advising them that Blue Shield had rescinded their coverage, effective November 1, 2004. As of the date the letter was sent, the charges to plaintiffs' policy totaled $972,761.66.

Plaintiffs filed suit against Blue Shield on July 13, 2006, alleging claims for breach of contract, breach of the duty of good faith and fair dealing, declaratory relief, and violation of Business and Professions Code section 17200. The gravamen of the complaint is that Blue Shield engaged in "postclaims underwriting" in violation of Health and Safety Code section 1389.3, which provides as follows: "No health care service plan shall engage in the practice of postclaims underwriting. For purposes of this section, 'postclaims underwriting' means the rescinding, canceling, or limiting of a plan contract due to the plan's failure to complete medical underwriting and resolve all reasonable questions arising from written information submitted on or with an application before issuing the plan contract. This section shall not limit a plan's remedies upon a showing of willful misrepresentation."[2]

Our knowledge of the procedural history of the case is limited because many of the relevant documents are not included in the record on appeal. It appears, based on the representations in the parties' briefs and the information in the record, that the following events transpired: The parties filed cross-motions for summary judgment, and the trial court ruled in favor of Blue Shield and against plaintiffs on both. After the court ruled but before it entered judgment, the Court of Appeal decided *Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452 [69 Cal.Rptr.3d 789] (hereafter *Hailey*), which interpreted section 1389.3 and articulated a standard for what constitutes postclaims underwriting. Plaintiffs filed a motion for new trial, and the court granted it and allowed Blue Shield to file a new motion for summary judgment addressing the *Hailey* standard.

Blue Shield then moved for summary judgment or, in the alternative, summary adjudication, arguing that under *Hailey* the rescission of plaintiffs' coverage was proper. Blue Shield contended that the undisputed facts showed that (1) Blue Shield had made reasonable efforts to confirm that plain-

---

[2] All subsequent statutory references are to the Health and Safety Code unless otherwise indicated.

tiffs' application was accurate and complete before issuing coverage, and (2) plaintiffs' misrepresentations were willful.

The trial court agreed with both of Blue Shield's contentions and granted the motion accordingly. The court entered judgment in favor of Blue Shield on October 29, 2005. Plaintiffs timely appealed.

## STANDARD OF REVIEW

We review the trial court's ruling on a motion for summary judgment or summary adjudication de novo. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766] [summary judgment]; *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972 [103 Cal.Rptr.2d 672, 16 P.3d 94] [summary adjudication].)

## DISCUSSION

### I. *Hailey* and *Nieto*

While this appeal was pending, the Court of Appeal decided another case dealing with postclaims underwriting, *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60 [103 Cal.Rptr.3d 906] (hereafter *Nieto*). Because *Hailey* and *Nieto* are the leading cases addressing the scope of the prohibition on postclaims underwriting, our analysis necessarily begins with an overview of both opinions.

*Hailey*, like this case, involved a claim against Blue Shield for engaging in postclaims underwriting in violation of section 1389.3. (*Hailey, supra*, 158 Cal.App.4th at pp. 459, 463–464.) The Court of Appeal reversed a summary judgment for the defense, holding that there were triable issues of fact as to whether Blue Shield's rescission of the plaintiffs' health plan contract was proper. (*Id.* at pp. 463–472.) In so holding, the court interpreted section 1389.3 as allowing a health care service plan to rescind a plan contract on the basis of material misrepresentations in the application if either of the following two conditions is satisfied: (1) The plan completed medical underwriting before issuing the plan contract, or (2) the subscribers *willfully* made material misrepresentations in their application. (158 Cal.App.4th at pp. 463–472.) According to the court, to complete medical underwriting the plan must "make reasonable efforts to ensure a potential subscriber's application is accurate and complete." (*Id.* at p. 469.)

"Because the circumstances of each case vary," the court did not "precisely spell out what steps constitute a reasonable investigation" but observed that "[t]his will usually present a question of fact." (*Hailey, supra*, 158 Cal.App.4th

at p. 469.) The court did, however, make a number of additional statements that bear on a health plan's duties to conduct a reasonable investigation. The court noted that Blue Shield had "performed its [preissuance] risk assessment on the assumption the application contained no errors" (*id.* at p. 466), but the court went on to state that "[g]iven the likelihood of inadvertent error, accurate risk assessment requires a reasonable check on the information the insurer uses to evaluate the risk." (*Id.* at pp. 466–467.) Accordingly, the court rejected Blue Shield's argument that "health care service plans may complete the 'medical underwriting' required under section 1389.3 by simply taking the submitted application and assigning values to the risks disclosed." (*Id.* at p. 467.) The court also distinguished various insurance rescission cases that had relied on Insurance Code section 331, which provides that "[c]oncealment, whether intentional or unintentional, entitles the injured party to rescind insurance." The court reasoned that a health care service plan is subject to the Knox-Keene Health Care Service Plan Act of 1975 (§ 1340 et seq.; hereafter Knox-Keene Act), not the Insurance Code, and "the Knox-Keene Act does not have a counterpart to Insurance Code section 331." (*Hailey, supra,* 158 Cal.App.4th at p. 470.)

Although *Nieto* also addressed postclaims underwriting, the defendant in that case was an insurance company subject to the Insurance Code, not a health care service plan subject to the Knox-Keene Act. (See *Nieto, supra,* 181 Cal.App.4th at pp. 65, 75–77.) The case therefore interpreted a different statutory prohibition on postclaims underwriting, Insurance Code section 10384, and did so in such a way as to harmonize it with other provisions of the Insurance Code and case law applying them. (181 Cal.App.4th at pp. 75–86.)

In *Nieto,* the defendant had prevailed on summary judgment. (*Nieto, supra,* 181 Cal.App.4th at p. 65.) The court affirmed on multiple grounds: (1) Insurance Code section 331 permits the insurer to rescind on the basis of the insured's intentional or unintentional failure to disclose material information in the application (*Nieto, supra,* 181 Cal.App.4th at pp. 76–77); (2) the undisputed facts showed that the insureds had fraudulently (i.e., intentionally) misrepresented their medical history during the application process[3] (181 Cal.App.4th at pp. 80–83); (3) *Hailey*'s "medical underwriting requirements" did not apply to the defendant insurer because they are "limited to health care service plans subject to the Knox-Keene Act" (*id.* at p. 85); but (4) even if *Hailey*'s requirements did apply, they were satisfied because the insurer's " 'underwriting process, *as applied here,* included appropriate steps to ensure the

---

[3] For example, one insured verbally informed an insurance sales agent that both insureds "were healthy and did not take any medications" (*Nieto, supra,* 181 Cal.App.4th at p. 82) when in fact one of the insureds had filled at least 10 prescriptions for four different medications within the last year, in addition to receiving two steroid injections and an oral steroid (*id.* at p. 66).

accuracy and completeness of [appellant's] Application' " (*id.* at p. 85, italics added). In particular, multiple employees of the defendant insurer had contacted the applicants "to obtain information missing from the application as well as to inquire about specific responses on the application that raised concerns." (*Id.* at p. 85.) The *Nieto* court thus did not disagree with *Hailey* but rather concluded that it was "both legally and factually inapposite." (*Nieto*, at p. 83.)

Blue Shield argues that *Hailey* was wrongly decided and should not be followed. We are not persuaded. Blue Shield contends, for example, that *Hailey* erred when it distinguished various insurance law cases on the ground that they all relied on Insurance Code section 331, which has no analogue in the Knox-Keene Act. (See *Hailey, supra,* 158 Cal.App.4th at pp. 469–470.) Blue Shield asserts that "in articulating the rule that insurers are not required to investigate or assume the falsity of applicant representations, not one of the cases summarily distinguished by *Hailey* based its reasoning on [s]ection 331." Blue Shield cites no authority for that claim. The relevant passage of *Hailey* refers to *Mitchell v. United National Ins. Co.* (2005) 127 Cal.App.4th 457 [25 Cal.Rptr.3d 627] (hereafter *Mitchell*), "and cases cited therein." (*Hailey, supra,* 158 Cal.App.4th at p. 469.) *Mitchell* and cases cited therein do base their reasoning on Insurance Code section 331. (See *Mitchell, supra,* 127 Cal.App.4th at pp. 467–468; see also, e.g., *Telford v. New York Life Ins. Co.* (1937) 9 Cal.2d 103, 105 [69 P.2d 835] [cited in *Mitchell*]; *Dinkins v. American National Ins. Co.* (1979) 92 Cal.App.3d 222, 232 [154 Cal.Rptr. 775] [cited in *Mitchell*].) Also, when Blue Shield later refers to the "long line of cases" that *Hailey* "[i]gnored" concerning insurers' right to rescind on the basis of innocent misrepresentations and "in the absence of complete underwriting," Blue Shield cites and quotes from four cases, all of which expressly rely on Insurance Code section 331 for the very propositions Blue Shield quotes. (See *Thompson v. Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 915–916 [109 Cal.Rptr. 473, 513 P.2d 353]; *West Coast Life Ins. Co. v. Ward* (2005) 132 Cal.App.4th 181, 186–187 [33 Cal.Rptr.3d 319]; *Wilson v. Western National Life Ins. Co.* (1991) 235 Cal.App.3d 981, 994 [1 Cal.Rptr.2d 157]; *Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 179–180, fn. 8 [243 Cal.Rptr. 639].)

We find Blue Shield's other arguments against *Hailey* equally unconvincing, and we find *Hailey*'s reasoning persuasive. We therefore choose to follow *Hailey*.

## II. Reasonable Efforts

Plaintiffs argue that Blue Shield failed to establish as a matter of law that its preissuance investigation met *Hailey*'s standard for the completion of medical underwriting. We agree.

Blue Shield's argument to the contrary is based on both (1) a description of Blue Shield's general procedure for preissuance medical underwriting and (2) a review of the particular underwriting steps taken concerning plaintiffs application. We consider each of these in turn.

Blue Shield provides the following description of its medical underwriting process (which plaintiffs do not dispute): First, Blue Shield "reviews all applications to determine whether the applicant has answered all medical questions and provided all other requested information, and if information is missing, sends an additional information request . . . to the applicant." Second, Blue Shield "enters all of the applicant's information into its underwriting system and reviews its systems to determine whether i[t] has any information concerning the applicant in its membership and claims systems and whether the applicant had any prior application history with Blue Shield." Third, "[u]nder certain defined circumstances, Blue Shield's underwriters request medical records from the medical providers listed on the application." For example, "Blue Shield requests records to examine disclosures made by the applicant regarding disclosed medical conditions that require further investigation to assess." Fourth, "Blue Shield conducts follow-up inquiries in certain situations, even when the application discloses no medical conditions or issues." For example, "Blue Shield requests medical records from any medical provider listed on the application if the visit was within 30 days of the date of the application, even when the application lists no adverse findings or conditions," and "[i]f the applicant discloses any unresolved tests, procedures or medical conditions, Blue Shield sends a request for medical records to the disclosed physicians to determine the applicant's current medical condition." "Blue Shield also will request medical records for applicants under one year old."

We cannot conclude as a matter of law that the described procedure constitutes "reasonable efforts to ensure a potential subscriber's application is accurate and complete." (*Hailey, supra,* 158 Cal.App.4th at p. 469.) As *Hailey* observed, "[g]iven the likelihood of inadvertent error, accurate risk assessment requires a reasonable check on the information the insurer uses to evaluate the risk." (*Id.* at pp. 466–467.) But Blue Shield's procedure may often, in practice, yield no such check. The only relevant steps that are uniformly taken in every case are (1) making sure that none of the required fields in the application has been left blank, and (2) checking Blue Shield's own "systems" for any prior application, membership, or claims history. If an applicant leaves no required fields blank and has no history with Blue Shield, then Blue Shield might take no further steps to confirm that the application is accurate and complete. Although Blue Shield does investigate further "[u]nder certain defined circumstances," Blue Shield neither purports to state exhaustively what those circumstances are nor explains why it is reasonable

not to conduct further investigation in *other* circumstances. On this record, we cannot conclude that Blue Shield's general procedure is reasonable as a matter of law.

Turning to the steps actually taken in this case, Blue Shield asserts that its underwriting process "worked here, as Blue Shield followed up with [plaintiffs], asking them to provide information missing from the first application." One of the pieces of missing information, however, had nothing to do with plaintiffs' medical history—the original application merely failed to identify the type of plan for which plaintiffs were applying. The other piece of missing information likewise concerned a required field in the application that had been left blank—applicants are required to identify their last physician visit, but Nazaretyan had failed to do so.

■ Blue Shield does not identify any efforts it undertook, beyond making sure that no required fields in the application were left blank (and presumably checking its own systems, as described above), to confirm that plaintiffs' application was accurate and complete. Again, "[g]iven the likelihood of inadvertent error, accurate risk assessment requires a reasonable check on the information the insurer uses to evaluate the risk." (*Hailey, supra*, 158 Cal.App.4th at pp. 466–467.) Blue Shield offers neither evidence nor argument that its failure to take any additional steps was reasonable as a matter of law.

For all of the foregoing reasons, we conclude that the undisputed facts fail to establish as a matter of law that Blue Shield made reasonable efforts to ensure that plaintiffs' application was accurate and complete. We therefore cannot affirm the judgment on that ground.

### III. Willful Misrepresentation

Plaintiffs argue that there are disputed issues of material fact as to whether they *willfully* misrepresented or omitted material information in their application. We agree.

According to plaintiffs' deposition testimony, Yusop filled out the applications, and plaintiffs merely signed them without reading them either before or after Yusop filled them out. Yusop himself testified that, apart from plaintiffs' signatures, all of the handwriting on the applications is his. (Blue Shield objected that this fact is irrelevant but did not otherwise dispute it.) Plaintiffs' position, in effect, is that because of both their limited education and English language skills and Yusop's expertise as an insurance broker, they trusted and relied on him to ask them for any necessary information and to record the

information accurately on the application (as well as to copy certain information from a previous application in his files).

Plaintiffs' account of the facts "is not patently unbelievable" (*Hailey, supra*, 158 Cal.App.4th at p. 464) and is supported by substantial evidence. If plaintiffs' version of the facts is true, then we cannot conclude as a matter of law that plaintiffs willfully misrepresented or omitted material information on their application. The trial court therefore erred by granting Blue Shield's motion for summary judgment on this ground as well.

Blue Shield approaches the issue of willfulness from an entirely different angle. Blue Shield argues that (1) willful misrepresentations include misrepresentations made with reckless indifference to their truth or falsity, (2) an insurance applicant has a legal duty to review the application before signing it and to correct or report any misrepresentations, and (3) an insurance applicant is consequently presumed to have read the application and to be aware of any misstatements, so (4) given that duty and that presumption, plaintiffs were at least reckless in failing to read their applications.

■ We are not persuaded. If Blue Shield's theory were correct, then it would mean that *anyone* who did what plaintiffs claim to have done— namely, rely on an insurance broker to ask them the necessary questions and record the information correctly—would have *willfully* made any resulting misrepresentations. Such a result would actually punish applicants who, because of their lack of education, English language skills, and familiarity with insurance forms, *reasonably* conclude that the best way to avoid making any material misrepresentations or omissions on their applications is (1) to trust an expert (an insurance professional) to guide them through the process, and (2) not to second-guess the expert's work. We cannot believe the Legislature intended the term "willful misrepresentation" in section 1389.3 to apply to errors or omissions produced by such applicants, who on the contrary are actively, innocently, and reasonably endeavoring to *avoid* making any material misrepresentations.[4]

Blue Shield also argues that Yusop's role in the process is irrelevant because, according to Blue Shield, Yusop was plaintiffs' agent but was not Blue Shield's. But Blue Shield does not contend or cite authority for the proposition that alleged recklessness on the part of Yusop can be imputed to plaintiffs even if their own conduct was, in itself, both innocent and reasonable. Without that additional premise, Blue Shield's arguments concerning the agency status of Yusop are of no consequence.

---

[4] We emphasize that our entire discussion of willful misrepresentation necessarily relates only to section 1389.3, not to any provision of the Insurance Code or any other law.

Apart from those legal arguments, the sole piece of evidence Blue Shield relies on in its respondent's brief concerning willfulness is the form requesting information that was missing from the original application. Blue Shield contends that Nazaretyan filled out the form himself and thereby "lied directly to Blue Shield" by stating that his last physician visit was an emergency room visit for an ear infection, when in fact he and Ghazaryan had recently consulted with a physician at the Pacific Fertility Center about beginning a new round of IVF treatments. We agree with plaintiffs that the document in question does not establish a willful misrepresentation by Nazaretyan as a matter of undisputed fact. Even if Nazaretyan completed the form himself (or provided the information to Yusop), he might have interpreted the question as referring to his last physician visit *concerning medical treatment for himself*, and he might consequently have thought that a physician visit with his wife concerning IVF treatment for his wife was not the kind of physician visit at issue. To counter that inference, Blue Shield points out that the Pacific Fertility Center had informed plaintiffs in 2002 that their fertility problem was due, at least in part, to Nazaretyan's own medical condition. But Blue Shield cites no evidence that plaintiffs ever sought or obtained treatment for any medical condition of Nazaretyan's that was causing fertility problems—instead, they sought IVF treatment for Ghazaryan. Accordingly, a reasonable trier of fact could conclude on this record that Nazaretyan did not willfully misinform Blue Shield when he told them his most recent physician visit was the emergency room visit for the ear infection.

We wish to emphasize that we do *not* hold that plaintiffs' version of the facts is true or that they acted in good faith or innocently or reasonably, and we of course express no opinion on the credibility of any witness. We hold only that on the record before us, the undisputed facts do not entitle Blue Shield to judgment as a matter of law on this ground.

For all of the foregoing reasons, we cannot, on this record, conclude as a matter of law that plaintiffs willfully misrepresented or omitted material information on their application. The trial court therefore erred by granting summary judgment on that ground.

## IV. Causation

Finally, Blue Shield argues that we should affirm the judgment on the ground that the rescission did not constitute unlawful postclaims underwriting because it was not "due to" any underwriting failure on the part of Blue Shield. (See § 1389.3 [prohibiting "the rescinding, canceling, or limiting of a plan contract due to the plan's failure to complete medical underwriting"].) More precisely, Blue Shield contends that plaintiffs introduced no evidence that "had any further inquiry of some sort been made [by Blue Shield,] it

would have revealed the concealed information." In short, Blue Shield argues that there are no disputed issues of fact as to causation. We reject the argument because we conclude that Blue Shield failed to carry its initial burden on this argument, so the burden never shifted to plaintiffs to introduce evidence of their own.

A defendant moving for summary judgment need only show "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Blue Shield did not make or attempt to make such a showing—that is, Blue Shield introduced no evidence that plaintiffs lack and cannot reasonably obtain evidence that the rescission resulted from an underwriting failure. The record is completely silent as to the efficacy of any steps Blue Shield could have taken but failed to take, and it is likewise silent as to whether plaintiffs could reasonably obtain favorable evidence on the issue.[5]

In urging us to affirm on this ground, Blue Shield seeks to have plaintiffs suffer the consequences of those gaps in the record. But because Blue Shield was the moving party, the total absence of evidence on this issue works to plaintiffs' benefit and Blue Shield's detriment. Blue Shield did not carry its initial burden, so the trial court erred by granting the motion for summary judgment on this ground as well.[6]

---

[5] Again, we do not hold that reasonable efforts to ensure that the application is accurate and complete would require Blue Shield to take some additional steps (that is, we do not hold that the failure to take such steps was unreasonable). We hold only that because Blue Shield has introduced no evidence concerning what would have happened if it had taken such steps, it has not carried its initial burden on the issue of *causation*.

[6] Plaintiffs also argue that the trial court erred in granting summary adjudication of the bad faith and punitive damages claims. In support of that argument, plaintiffs contend that their case is factually similar to *Hailey*, which reversed summary adjudication of bad faith and intentional infliction of emotional distress claims on the ground that there was a substantial and material delay between Blue Shield's discovery of material misrepresentations in the plaintiffs' application and Blue Shield's notice to the plaintiffs that their health coverage was terminated. (*Hailey, supra*, 158 Cal.App.4th at pp. 472–476.) We reject plaintiffs' argument because this case is factually distinguishable. In *Hailey*, Blue Shield referred the plaintiffs' case to the underwriting investigations unit (now known as the ERU) on February 8 and promptly discovered the plaintiffs' material misrepresentations, but Blue Shield did not rescind until June. (See *id.* at pp. 461, 473.) Here, there is no evidence of a similar delay. Blue Shield's *medical management unit* was aware in May 2005 that plaintiffs' twins were the product of IVF, but the record contains no evidence that anyone in the medical management unit had any reason to believe at that time that the information was of any significance. Blue Shield did not refer plaintiffs' case to the ERU until November 2005, and the record contains no evidence that Blue Shield was or should have been aware sooner that the case warranted referral. Nor does the record contain evidence that Blue Shield did not investigate and notify plaintiffs sufficiently quickly after the referral. Accordingly, we reject plaintiffs' argument, and we conclude that summary adjudication of the bad faith and punitive damages claims was properly granted.

## DISPOSITION

The judgment is reversed, and the superior court is directed to enter a new and different order granting Blue Shield's motion for summary adjudication of the bad faith and punitive damages claims but denying in all other respects Blue Shield's motion for summary judgment or, in the alternative, summary adjudication. Appellants shall recover their costs of appeal.

Chaney, J., and Johnson, J., concurred.

A petition for a rehearing was denied April 13, 2010.